FLORENCE v. MOORS CONCRETE PRODUCTS, INC.

SPENCER v. MOORS CONCRETE PRODUCTS, INC.

1. TRIAL—PARTY'S PRESENCE IN COURT.

A party has an absolute right to be present at all stages of
the court proceedings, whether civil or criminal, and cannot
be excluded from the courtroom during those proceedings.

2. TRIAL—EXCLUDING PARTY—REREADING INSTRUCTIONS TO JURY.

Excluding the plaintiffs from the courtroom, over the plaintiffs'
objections, during a rereading of the charge to the jury con-
stituted reversible error, because the plaintiffs had an absolute
right to be present at all stages of the court proceedings;
defense counsel's argument on appeal that excusal of the plain-
tiffs was harmless because no prejudice can be shown is un-
acceptable since defense counsel is not in a position to know
whether any prejudice resulted.

3. TRIAL—INSTRUCTIONS TO JURY—BURDEN OF PROOF—APPEAL AND
ERROR.

Instructions concerning burden of proof are essential to a proper
consideration by the jury of the issues presented; failure to
object to an improper instruction on the burden of proving
contributory negligence or failure to object to the omission
of an instruction on the burden of proving contributory neg-
ligence does not preclude review on appeal (GCR 1963, 516.2).

4. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—BURDEN OF PROOF—IN-
STRUCTIONS TO JURY.

Statement at the commencement of the instructions to the jury
that the plaintiffs had the burden of proving their case except

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 53 Am Jur, Trial §§ 19–30.
[2] 53 Am Jur, Trial § 535.
[3, 4] 53 Am Jur, Trial §§ 555, 649, 657, 680, 748.
[5] 47 Am Jur, Sales (Conditional Sales) §§ 885–890.

for contributory negligence was not a sufficient instruction on the burden of proving contributory negligence.

5. Torts—Warranties—Requirements—Passage of Title.

A completed sale with title passing to the buyer is not a predicate for the presence of warranties and is not a requisite element in tort actions for breach of warranty.

Consolidated appeals from Wayne, Thomas J. Foley, J. Submitted Division 1 February 9, 1971, at Detroit. (Docket Nos. 8383 and 8384.) Decided August 30, 1971. Leave to appeal denied, 387 Mich 761.

Complaints by Bessie I. Florence and Alice Rose Spencer, administratrices of the estates of Edward J. Florence and George C. Spencer, respectively, against Wm. Moors Concrete Products, Inc., Lester H. Davies, Inc., Lester H. Davies, Record Construction Company, and Avonster Corporation, for wrongful death and against Moors for breach of warranty. Liberty Mutual Insurance Company, workmen's compensation insurance carrier for plaintiffs' decedents' employer, intervened as a plaintiff. Verdict and judgment of no cause of action. Plaintiffs appeal. Reversed for a new trial against all defendants except Record Construction Company. Affirmed as to Record Construction Company.

*Kelman, Loria, Downing & Schneider,* for plaintiff administratrices.

*Johnson, Campbell & Moesta,* for plaintiff Liberty Mutual Insurance Co.

*Vandeveer, Doelle, Garzia, Tonkin & Kerr,* for defendant Wm. Moors Concrete Products, Inc.

*Feikens, Dice, Sweeney & Sullivan,* for defendant Avonster Corporation.

*Martin, Bohall, Joselyn, Halsey & Rowe, P.C.,* for defendant Record Construction Co.

*Harvey, Kruse & Westen, P.C.,* for defendants Lester H. Davies, Inc., and Lester H. Davies.

Before: DANHOF, P. J. and HOLBROOK and BRON- SON, JJ.

## ON REHEARING

HOLBROOK, J.   These consolidated wrongful death actions were brought by the administratrices of the estates of Edward J. Florence and George C. Spencer. This cause of action arises from the collapse of a building under construction in Dearborn, Michigan. Plaintiffs' causes of action were based upon the negligence of William Moors Concrete Products, Inc., manufacturer of Doxplank; Lester H. Davies, as an individual; Lester H. Davies, Inc., engineer; Record Construction Company, contractor; and Avonster Corporation, also known as Dearborn Towne, House, Inc., owner of the building. Additionally, plaintiffs based their causes of action against defendant Moors on breach of express and implied warranty. Liberty Mutual Insurance Company, workmen's compensation insurance carrier for Pittsburgh Testing Laboratories, Inc., intervened as a plaintiff. After full trial before a jury, verdict in favor of defendants of no cause of action was rendered. Plaintiffs have taken these appeals.

Sometime before 1962, Harry Chrysan, president of Avonster Corporation, was desirous of having a motel constructed. He contacted and contracted

with Mr. Lester Davies, an engineer and president
of Lester H. Davies, Inc., to design the building and
draw the plans. The contract was entered August
7, 1961. The blueprints called for 100 units
separated into sections A, B, and C. The building
permit was issued to Lester H. Davies, Inc., on
January 29, 1962. The Record Construction Com-
pany was hired as the general contractor for the
job. In the original plans for the building, com-
ponents known as Twin-T and Flexicor were to be
utilized for the floors and ceiling. These items are
precast concrete slabs that are very popular in the
building trade. After much discussion and consul-
tation, between the owner, engineer, and general
contractor, it was decided that a material known as
Doxplank would be used as the floor and roof com-
ponent rather than Flexicor and Twin-T. The sole
franchisee of Doxplank in the Detroit area is the
William Moors Concrete Products, Inc. Use of
Doxplank reduces substantially time of construction
and costs of labor. Procedure for manufacture of
Doxplank is uncomplicated. Basic components of
the Doxplank units are concrete blocks. Doxplanks
are preformed concrete planks tongued and grooved
and fit together to form either floor or ceiling.
Cement blocks 8 x 8 x 16 (inches) which contain
two-inch holes in each corner and a void in the mid-
dle are laid together horizontally. One-inch de-
formed steel bars are forced through the holes in
each corner and run the length of the blocks. A
grout composed of sand, water, and lime is forced
into the area between the two-inch hole and the
one-inch deformed steel bars. The blocks are then
compressed together on a vise-like machine and
placed into a kiln at temperatures of 100° to 115°
for a period of 48 to 72 hours to be cured. The
procedure for manufacture of Doxplank is ap-

proved and sanctioned by the American Concrete Institute. Doxplanks are available in different lengths. The ones in question here were 30 feet long. The Doxplanks here were furnished and installed on the job site by the William Moors Concrete Products, Inc., a subcontractor of Record Construction Company. Davies testified at the trial that on one of his visits to the job site, he noticed longitudinal cracks in the planks installed and those about to be installed. He informed Mr. Chrysan of this condition. Davies wanted them removed because it interfered with the aesthetic beauty of the structure. Davies at trial testified that on December 2, 1962, and on a few subsequent occasions he had attempted to have his name removed from the building permit. He stated the reason to be that he had no control over the job and anything that went wrong was his responsibility. His attempts were unsuccessful. Davies testified that he discussed the Doxplank problem with Mr. Walter Halen, superintendent on the job for Record Construction Company. He suggested that Halen have these defective planks removed. On January 21, 1963, a notice of violation was received from the Dearborn Building Inspector's Office. On January 29, 1963, a letter from Record Construction Company by its president Mr. Roman Helenski was sent to Moors Concrete Products, Inc., giving formal notice that it was a request to have the defective Doxplank removed. The letter also indicated the dissatisfaction of Chrysan and Davies and that a violation had been issued from the city rejecting the Doxplank. Mr. Andrew Rosasco, president of Moors Concrete Products, Inc., testified that on January 30, 1963, he had removed three of the Doxplank from the building site and returned them to his company yard to perform a test on them.

These blocks were not in the building itself but were present on the site awaiting use in the structure. The testing was completed on February 1, 1963. From the result of the test he concluded the blocks were structurally sound. He informed Davies and Chrysan of this and offered to give a written guarantee for the Doxplank for the life of the structure. He testified that after the test was finished he destroyed the blocks. On February 18, 1963, Davies wrote a letter to the City of Dearborn building inspector requesting that the Doxplank be allowed to remain in the structure. He represented that the Doxplank had been tested by Moors and that they were found to be structurally sound, and further that Moors was willing to give the guarantee mentioned. This letter was also signed by Harry Chrysan. Davies testified that the inducement for writing this letter was representations made to him by Chrysan that if this request was made, a subsequent test would be required by the city. Davies contended that for this reason only he wrote the letter and not because he was convinced of the structural soundness of the material. Upon receipt of this letter, the city ordered a test to be performed on those planks already installed. Moors Concrete then contracted with the Pittsburgh Testing Laboratories to perform an on-the-site test of the planks. A field man was sent out to check over the testing site in question a few days prior to the testing date. The usual test given in a situation like this is a deflection test. This test indicates a technique whereby the degree to which the planks will bend under pressure is determined. Under standards of the A.C.I.,[1] a certain level of deflection is allowed. Beyond this level, the planks will be judged un-

---

[1] American Concrete Institute.

sound. The procedure involved is to place weight upon the area in question. The weight here as dictated by A.C.I. standards was to be twice the design live load. In this instance, the design live load is 40 pounds per square foot. For testing purposes it would be 80 pounds. When performing the deflection test, the area thought to provide the least margin of safety is selected as the test site. Here, a portion of section C of the structure was chosen. The actual tested area was 24 x 9–1/2 square feet. A reading is taken prior to placing the test load on the area. Once this reading is taken, weight is evenly placed on the test area. A.C.I. standards called for a 24-hour period before the next deflection reading is taken. Here, the load was being placed manually by the employees of William Moors, Inc. There are two ways to take a reflection reading. The one plan to be used here was to go under the test site 24 hours after the load is placed. The other is to set an instrument on the transit and set up gauges under the point before the load is applied, and then stand outside the area and read on the transit the degree of deflection after the load is placed. March 7, 1963, was the date selected for the test. Plaintiffs' decedents were present at the scene to make the test. They were day laborers being paid at the rate of $2.50 per hour. They had considerable experience in the field in which they were working. Before the collapse, plaintiffs' decedents were last seen by the side of the truck weighing blocks that were being placed on top of the test area. Testimony of those present at the site indicated that no one saw plaintiffs' decedents go under the area. When the collapse occurred, 80% to 90% of the test load had been applied.

Plaintiffs on this appeal raise several claims of reversible error and we consider three of these issues in order to properly dispose of this matter.

## I.

The trial court erred in excluding the plaintiffs from the courtroom over their individual objections and the objection of their counsel during part of the proceedings, namely the rereading of the charge to the jury.

Because of the complicated nature of the charge the jury requested further instructions after it had begun its deliberation. It was decided that the entire charge would be reread to the jury. Before the jury was returned for this purpose counsel for defendant Moors moved to exclude plaintiffs Bessie Florence and Alice Spencer from the courtroom. Plaintiffs' counsel objected and Mrs. Florence and Mrs. Spencer declined the court's invitation to leave the courtroom voluntarily. The court then instructed them to leave and they did. Plaintiffs maintain they have an absolute right to be present at all stages of the proceedings regardless of whether criminal or civil in nature. We agree with this contention.

The Michigan Supreme Court has clearly declared that a party cannot be excluded from the courtroom during proceedings in open court. In support of this proposition we cite the following from *McIntosh* v. *McIntosh* (1890), 79 Mich 198, 203:

"It is a matter generally within the discretion of the court to exclude witnesses; but, when such discretion is exercised, it should not be in a manner prejudicial to either side of the controversy, and all witnesses should be excluded who are to be called to that point, whether they are witnesses of plain-

tiff or defendant.   There is no rule, however, by which the court is authorized to exclude a party to the controversy."

In the case of *Fillippon* v. *Albion Vein Slate Co.* (1919), 250 US 76, 81 (39 S Ct 435, 436, 63 L Ed 853, 855–856) the Court stated:

"We entertain no doubt that the orderly conduct of a trial by jury, essential to the proper protection of the right to be heard, entitles the parties who attend for the purpose to be present in person or by counsel at all proceedings from the time the jury is impaneled until it is discharged after rendering the verdict.   *   *   *   In this case the trial court erred in giving a supplementary instruction to the jury in the absence of the parties and without affording them an opportunity either to be present or to make timely objection to the instruction."

The argument of defense counsel that excusal of the plaintiffs from the courtroom was harmless because no prejudice can be shown is unacceptable. Defense counsel is not in a position to know whether in fact any prejudice resulted.

We conclude that reversible error was committed by the trial judge in requiring the plaintiffs to leave the courtroom during the rereading of the instructions to the jury.

## II.

The trial court's charge on contributory negligence was erroneous in that it did not understandably indicate that the burden of proof was on the defendants.

The pertinent part of the charge is set out below.

"As we approach these, as we break down and define the terms that we are talking about, I think it is necessary that you keep in mind that the plain-

tiff has the burden of proving his case. There will be two exceptions in this case: the question of contributory negligence and the question of whether there was a misuse of the Doxplank. I will explain that as we go along.

"The burden of proof is on the plaintiffs. The plaintiffs must prove sufficient facts so that he has sustained the burden of proof of proving the facts by a preponderance of the evidence. The burden does not shift. The defendants need not prove facts themselves, except in one of the two exceptions which I will list as we go along. All the proof must come from the plaintiffs."

We have carefully read the instructions and we fail to find where the trial judge ever gave any further instruction on burden of proof concerning contributory negligence of plaintiffs' decedents. It is true that the plaintiffs did not object to the instruction as given on contributory negligence, as required by GCR 1963, 516.2; however, we rule that instructions concerning burden of proof are essential to a proper consideration by the jury of the issues presented. *Hunt* v. *Deming* (1965), 375 Mich 581. We believe that the trial judge meant to explain the burden of proof later on in his instructions, but evidently failed to do so. Under the circumstances of this case we determine that it was reversible error for the trial judge to have failed to instruct that the burden was upon the defendants to prove the contributory negligence, if any, of the plaintiffs' decedents. *Sayles* v. *Lilak & Moore, Inc.* (1971), 32 Mich App 721.

### III.

The trial court erred in instructing the jury that in order to hold the defendant manufacturer of the

defective Doxplank liable to plaintiffs for breach of warranty and breach of implied warranty of fitness they must find that title to the Doxplank had passed to the purchaser, Record Construction Company, at the time of the fatal injuries.

The portion of the charge concerning breach of warranty is set out below:

"Now we move on to the question of whether there was a breach of warranty. It is necessary for you to get into the question of breach of warranty to determine whether there was a sale.

"I charge you, ladies and gentlemen, that a sale of goods is an agreement whereby the seller transfers the property or title in goods to the buyer for a consideration called a price. You transfer the property in payment of the price, and there is an agreement to do this. The intentions of the parties is [*sic*] all controlling. They may determine that the price may be paid over a period of time, may be paid later, may be paid before delivery. It depends on what the parties agree to.

"In this case the plaintiffs maintain there was a sale, and that because of this there were warranties attached and there was a breach of these warranties. As I stated earlier, the only defendant involved in this particular question of whether there was a breach of warranty and whether there was a sale is defendant Moors Concrete Company. They maintain there was no sale and therefore no warranty could follow.

"Plaintiff states in the answer to the pleadings in the lawsuit defendant Moors admitted a sale, and that in an interrogatory, or question, submitted to the defendant Moors a sale was again admitted.

"Defendant Moors states, through the testimony of Mr. Rosasco, evidence in the case shows that many conditions had to be performed before there was an actual sale and before title passed. You remember the facts in greater detail than that, but just to recall the substance of the issue at hand.

"Weighing all the facts you will first of all make a determination based upon the facts whether there was in fact a sale of the Doxplank in question. If you find there was no sale of the Doxplank your deliberation on the question of a warranty will stop at this point. If you find there was a sale, then you will continue on.

\*        \*        \*

"I further charge you that proof of negligence in this case must not rest alone on mere conjecture, surmise and speculation. If it would be necessary to base a verdict for the plaintiffs upon mere conjecture, surmise and speculation rather than upon credible evidence, your verdict would then be for the defendants no cause of action.

\*        \*        \*

"I further charge you ladies and gentlemen that the so-called express or implied warranty, which may be summarized as warranty of quality of a product such as Doxplank in this case, are not available to the plaintiffs for the cause of action until such time as the title to the Doxplank has passed from Moors, the manufacturer and installer, to the Record Construction, the purchaser. If you find that the contract proposal from Moors for the manufacture, sale and installation of the Doxplank was dependent upon the job specifications, upon approval of the Doxplank after its installation by the Building Department Inspector of the City of Dearborn, as well as by the owner, Avonster Corporation, the general contractor, Record Construction Company, and design engineer, Lester H. Davies, individually, then I charge you you may not find that a sale of Doxplank had resulted until all the conditions had been met."

The law is well settled that title passage is not the predicate for presence of warranties.[2]

---

[2] The cause of action arose prior to the adoption of the Uniform

In the case of *Piercefield* v. *Remington Arms Company, Inc.* (1965), 375 Mich 85, 96, the Court uses the following language:

" 'There seems to be some confusion in understanding the nature of implied warranty liability. In the first place, concepts of negligence and fault, as defined by negligence standards, have no place in warranty recovery cases. Proof of negligence is unnecessary to liability for breach of implied warranty and the lack of it is immaterial to defense thereof. Since the warranty is *implied,* either in fact or in law, no express representations or agreements by the manufacturer are needed. Implied warranty recovery is based upon two factors: (a) The product or article in question has been transferred from the manufacturer's possession while in a "defective" state, more specifically, the product fails either to be "reasonably fit for the particular purpose intended" or of "merchantable quality," as these two terms, separate but often overlapping, are defined by the law; and (b) as a result of being "defective," the product causes personal injury or property damage.' "

In support of its contention that warranties do not attach until title passes, defendants cite *Bunday* v. *Columbus Machine Co.* (1906), 143 Mich 10, and *Moneyweight Scale Co.* v. *David* (1914), 180 Mich 8. These two cases are distinguishable from the present one because they are examples of actions relating to breach of warranty in contract, whereas, in the case before us the plaintiff's action is in tort. We here adhere to the language in *Piercefield, supra,* and do not accept completed sale as a requisite ele-

Commercial Code in Michigan and our holding is not based on the UCC. A split of authority exists regarding the disposition of this issue under the Uniform Commercial Code, the more enlightened courts extend the implied warranty to leases and bailments, as well as actual sale transactions under the Uniform Commercial Code. See Sales and Bulk Transfers Under the UCC (3 Bender's Uniform Commercial Code Service, § 7.01(2)(b), p 7–4).

ment in actions for breach of warranty. For this reason we find that the instruction given by the trial judge was so erroneous as to constitute reversible error.

Defendants Record Construction Company, Avonster Corporation, Lester H. Davies, Inc., and Lester H. Davies assert that there was no evidence presented showing negligence on their part causing the deaths of plaintiffs' decedents. After a careful review of the transcript and the pleadings, we find that the allegations of negligence on the part of defendant Record Construction Company are unsupported by any evidence. The motion for a directed verdict in favor of the defendant Record Construction Company, if granted, would have been proper. Our reversal and grant of a new trial is not applicable to defendant Record Construction Company. As to Avonster Corporation, Lester H. Davies, Inc., and Lester H. Davies, there is evidence of negligence on their part in inducing the city authorities to permit the defective Doxplank to remain in the building. This presents an issue of fact which must be determined by the jury as to whether or not this alleged negligence on their part caused the deaths of the plaintiffs' decedents.

This determination disposes of the cross-appeals of Avonster Corporation, Lester H. Davies, Inc., and Lester H. Davies, jointly and severally.

Other errors are asserted by plaintiffs that we do not discuss because they are not necessary for a decision in this matter nor do we think that they will recur on a retrial of the case.

Reversed and remanded for new trial as to all defendants except Record Construction Company. Costs to plaintiffs and defendant Record Construction Company.

All concurred.