**Jack RYFEUL, Appellant,**

**v.**

**May RYFEUL, Appellee.**

**Nos. 5170, 5405.**

Supreme Court of Alaska.

Sept. 10, 1982.

William F. Bulchis and Carol Zamarello, *Collins, Inc., P.C., Anchorage, for appellant.*

William T. Ford, Anchorage, for appellee.

Before BURKE, C.J., RABINOWITZ, CONNOR, MATTHEWS and COMPTON, JJ.

## OPINION

RABINOWITZ, Justice.

May and Jack Ryfeul were married in Tripoli, Lebanon, in 1973 and moved to Alaska that same year. In 1974, a child was born to them.[1] Differences arose between the parties the following year, and Jack filed a complaint for divorce. The parties attempted a reconciliation in 1976, but at May's request, the divorce complaint was not dismissed. In 1977, May left with the child to visit her family in Lebanon.[2] During May's absence, Jack filed a complaint, seeking a divorce and custody of the child.[3] The divorce was granted by default

1. Jack is now 66 years old and May is 39.

2. Before May left Alaska, Jack sought a temporary restraining order to prevent her from leaving the state with the child. The motion was dismissed without prejudice.

3. Jack's dealings with the superior court seem to have been less than forthright. He failed to notify the court that the 1975 case was still pending. He also failed to inform the court of May's whereabouts even though he had been in contact with her. Finally, he advised the court

in November 1978. The court determined that there were no property rights to be adjudicated and awarded Jack custody of the child.

In January 1979, soon after May returned from Lebanon, she filed a motion to set aside the portions of the divorce decree that dealt with custody and property rights. She also requested a new hearing on these issues. After two hearings, the court awarded May temporary custody of the child and granted her pendente lite $150 a month personal support, $150 a month child support, and $1,000 attorney's fees.[4]

After Jack refused to pay any of the alimony and attorney's fees ordered by the superior court, May filed a motion for an order to show cause.[5] May also requested and was granted additional attorney's fees pendente lite in the amount of $4,000. Because a translator was not available for Jack,[6] a hearing on the show cause order in December was continued until February 1980.[7] When Jack failed to appear at the February contempt trial, the superior court ordered that a bench warrant be issued for his arrest.[8]

On April 21, 1980, the third and final hearing on May's motion to vacate and modify portions of the divorce decree was held. Jack was not present at this hearing. When he appeared at the courthouse on the day of the hearing, May's attorney informed the Alaska State Troopers of his presence, and he was arrested pursuant to the outstanding bench warrant. Despite Jack's absence, the court proceeded with the hearing. At the conclusion of the hearing, May was awarded custody of the parties' minor child, $300 a month alimony, $300 a month child support, and various pieces of property, including lands in Lebanon owned by Jack prior to the parties' marriage.

The twice-delayed contempt trial was finally held, before a jury, on May 27, 1980.[9] At the conclusion of the parties' evidence, the superior court, on motion of May's counsel, entered a directed verdict against Jack finding him in contempt. The superior court ordered that Jack be jailed for a 15-day period, with an additional 120-day period of incarceration suspended on the condition that Jack make additional monthly payments of $200 until he fully paid his arrearages.

This appeal is taken from the superior court's modification of the original divorce decree and from its judgment in the contempt trial. Specifically, Jack contends that the superior court violated his right to due process by holding the modification hearing in his absence. He also argues that the court erred in granting May support, in increasing the amount of monthly child support, and in awarding his premarital property to May. Finally, Jack asserts that the superior court should not have directed a verdict in the contempt trial.

that there was no disputed property even though the 1975 case had involved property questions.

4. Jack did not attend either of these hearings. He was out of the country on business at the time of the first hearing. His absence from the second hearing was apparently due to a misunderstanding with his attorney.

5. Since the second hearing on May's motion to modify the divorce decree, Jack has not paid any alimony or attorney's fees. Child support payments have been paid irregularly.

6. Jack was born in Lebanon and apparently has only a rudimentary grasp of English.

7. At the December hearing the superior court ordered that a judgment debtor examination be held. Pursuant to an in-court search which the court directed the Alaska State Troopers located $408 on Jack's person.

8. Jack had embarked on a cross-country tour to Washington, D.C., Georgia, Louisiana, and Nevada. He apparently went to Washington to discuss his case with President Carter, and apparently talked with Billy Carter in Georgia about his case.

9. The matter was a civil contempt proceeding. AS 09.50.050 provides:

> *Sec. 09.50.050. Imprisonment to compel performance of an act.* When the contempt consists of the omission or refusal to perform an act which is yet in the power of the defendant to perform, he may be imprisoned until he has performed it.

I. *The Modification Hearing.*

At the outset of the April 21 hearing on modification of the divorce decree, May's attorney apprised the superior court that he had seen Jack in the courthouse earlier in the day and had notified the Alaska State Troopers of Jack's presence. Counsel further informed the court that the troopers had taken Jack into custody pursuant to the court's outstanding bench warrant. In response, Jack's attorney requested the presence of his client before the hearing proceeded.[10] The court then initiated a search for Jack. Apparently he had just been booked and was in the parking lot, waiting to be transferred to the jail. The in-court clerk then asked the court whether she should radio to the parking lot and have Jack brought up. The court, however, decided to hold the hearing without requiring Jack's presence.

Jack contends that by proceeding with the modification hearing in his absence, the superior court violated his right to due process under the fourteenth amendment to the United States Constitution as well as his right to due process under article I, section 7 of the Alaska Constitution.

May contends that Jack's right to due process was not violated by the court's holding the modification hearing in his absence. She specifically argues that no court rule or decision mandates a party's presence at a civil proceeding, that Jack's attorney was able to proceed adequately without Jack, and that Jack was the author of his own harm and could not have appeared at the hearing without being incarcerated.

We have previously stated that the right to due process requires "that every man shall have the protection of his day in court." *Johnson v. Johnson,* 544 P.2d 65, 70 (Alaska 1975) (citing *Truax v. Corrigan,* 257 U.S. 312, 332, 42 S.Ct. 124, 129, 66 L.Ed. 254, 263 (1921)). Given the circumstances of this case, particularly the superior court's awareness of Jack's frustrated attempt to attend the hearing, the relative ease with which his presence could have been secured, and the importance of the questions at issue in the modification hearing, we hold that proceeding with the hearing in Jack's absence was a violation of his right to due process under the Alaska Constitution and that the modification decree must therefore be vacated.

A sampling of the case law supportive of this holding follows. In *In re Watson,* 91 Cal.App.3d 455, 154 Cal.Rptr. 151 (Ct. App. 1979), the court held that even if his attorney were present an individual could not be excluded from a commitment hearing that might result in his suffering a substantial loss of liberty. The court stated:

> The fact that constitutional rights are most frequently vindicated in criminal cases should not blind us to the truth that certain fundamental constitutional rights are guaranteed to *every person,* not solely to those who are accused of criminal activity. Due process is one such fundamental right.... The right of a defendant's personal presence at trial is a condition of due process to the extent that a fair and just hearing would be thwarted by the absence of the accused.

*Id.* at 155 (emphasis in original). Similarly, in *Helfferich v. Farley,* 419 A.2d 913 (Conn. Super. Ct. 1980), the court rejected the defendant's motion to take the deposition of one plaintiff outside the presence of the other plaintiff. "The taking of a deposition is a part of the trial and each party to a litigation has an undoubted right to be

10. Jack's attorney did not strenuously object to his absence. The superior court asked counsel if he wanted Jack brought up, and he responded, "Well if he's here, yes." When the superior court finally decided to proceed without Jack, his attorney made no objection. Later, at the conclusion of the proceeding, he did object to Jack's absence: "I think that [modification of the divorce decree] can only be done upon a full hearing of the facts which certainly is not afforded the—Mr. Ryfeul here since he's not even in attendance."

In light of the superior court's knowledge of Jack's attempt to attend the hearing, we think his attorney's conduct—the failure to object when the court decided to proceed without Jack—did not constitute a waiver of this claim of error. We hold that counsel's initial request that Jack be present at the hearing is adequate to preserve the point for appeal.

present at the trial. The right of a party to be present during the course of a trial is basic to the trial process." *Id.* at 914 (citations omitted). Further, in *Carlisle v. County of Nassau,* 64 A.D.2d 15, 408 N.Y. S.2d 114 (1978), the court held that the plaintiff had a constitutional right to be present during jury selection and that denial of that right because his appearing in court in a wheelchair might influence potential jurors was prejudicial per se. "A party to a civil action not in default is entitled to be present in the court room." *Id.* at 116.

In *Florence v. Wm. Moors Concrete Products, Inc.,* 35 Mich.App. 613, 193 N.W.2d 72 (1971), the court ruled that it was reversible error to require the plaintiffs in a wrongful death suit to leave the courtroom while the judge reread the charge to the jury. It agreed with the plaintiffs' contention that they had "an absolute right to be present at all stages of the proceedings regardless of whether criminal or civil in nature." [11] *Id.* at 75. *See also Gonzales v. Harris,* 189 Colo. 518, 542 P.2d 842 (1975); *Gallavan v. Hoffner,* 154 Colo. 353, 390 P.2d 817 (1964); *Harter v. State,* 260 Iowa 605, 149 N.W.2d 827 (1967).

May argues that the presence of Jack's attorney was sufficient to protect his interests, that Jack's absence did not hinder the presentation of his case, and that Jack probably would not have been called upon to testify even if he had been present.[12] One of the principal issues addressed at the modification hearing was Jack's economic situation—his ability to pay an increase in alimony and child support and the impact that an invasion and division of his premarital property would have on his financial position.[13]

Review of the record of the modification hearing discloses that the evidence relating to Jack's income at that time was at best meager. There was some evidence of certain previous expenditures on Jack's part, but their relationship to Jack's financial state at the time of the hearing was tenuous and never fully explained.[14] Jack's presence at the hearing in all probability could have cleared up many of the unan-

11. While many cases can be found for the proposition that a party has a right to be present at his own proceeding, the rule has been stated in varying ways. Some courts hold that the right is absolute. *Carlisle,* 408 N.Y. S.2d at 116–17. Others, rejecting the concept of an absolute right, balance the right to be present against other considerations. *Whitfield v. Roth,* 10 Cal.3d 874, 519 P.2d 588 (1979) (in medical malpractice case, limiting minor plaintiff who was paralyzed in both legs and right arm to a 10-minute appearance in the courtroom was not an abuse of discretion).

12. Some cases hold that it is not error (or at least not error significant enough to require a new proceeding) for a court to exclude a party from a proceeding unless that party was prejudiced by his absence. *Scott-Hourigan Co. v. Deprez,* 203 Neb. 493, 279 N.W.2d 150 (1979).

13. The determination of alimony awards, child support, attorney's fees, and property division all to varying degrees require an examination of both spouses' current financial positions. We have suggested that the factors listed in *Merrill v. Merrill,* 368 P.2d 546, 547 n.4 (Alaska 1962), be used as guidelines in determining property divisions and alimony awards. In *Messina v. Messina,* 583 P.2d 804 (Alaska 1978), several of the listed factors relate to present economic ability: 1) the parties' earning capacity, 2) the circumstances and necessities of each, 3) their financial circumstances, including the time and manner of acquisition of the property in question, its value at the time, and its income producing capacity if any. For cases examining the parties' relative economic abilities, see *Courtney v. Courtney,* 542 P.2d 164, 169 (Alaska 1975) (property division); *Johnson v. Johnson,* 564 P.2d 71, 76–77 (Alaska 1977) (attorney's fees); *Hinchey v. Hinchey,* 625 P.2d 297, 304–08 (Alaska 1981) (alimony).

14. At the hearing it was disclosed that Jack had often appeared with thick wads of money, had said he owned stock, had travelled extensively, and had put bail up for (and to some extent supported) a young man. These facts, however, had little bearing on Jack's economic condition at the time of the hearing, especially given the small income he made selling flowers at bars and the debts he had accumulated. In short, nothing in the record suggests that Jack could or would be able to make the payments ordered. To the extent that questions concerning Jack's financial situation remained unanswered, it was an abuse of discretion for the trial court to modify the alimony, child support, and property division provisions of the original default divorce decree *See Faro v. Faro,* 579 P.2d 1377, 1380 (Alaska 1978).

swered questions concerning his economic situation. Moreover, we believe that, absent compelling circumstances to the contrary, a party to a proceeding like the hearing in this case has the right to be present, regardless of whether he is in a position to affect the outcome of the proceeding. Jack's right to be present at the modification hearing was not forfeited merely because his attorney was there to represent him:

> The suggestion . . . that a party somehow forfeits his constitutional right to be present at any and all stages of the trial when represented by counsel has no basis either in law or logic. . . . Although a party may not act in person at trial of the action when represented by an attorney except by consent of the court, his right not only to be an interested and concerned observor of a proceeding which ultimately affects him, but to help plan and plot trial strategy is in no way denigrated by the presence of retained or assigned counsel. The attorney is not the alter ego of his client, but his representative or agent. As such he may not supplant the client either at his or the court's unbridled pleasure.

*Carlisle,* 408 N.Y.S.2d at 117 (citation omitted).

■ May further argues that Jack was the author of his own harm in that his failure to appear at the February contempt hearing resulted in the issuance of the bench warrant for his arrest. This argument, however, ignores the fact that if May's attorney had not insisted on the execution of the bench warrant, Jack would have been able to attend the modification hearing. Furthermore, we do not believe that the fact that Jack had been arrested for failure to attend the contempt hearing was reason enough to justify the court's proceeding with the modification hearing in his absence. Jack's failure to attend the modification hearing was not negligent or intentional but was caused by factors beyond his immediate control.

II. *Directed Verdict.*

In *Johansen v. State,* 491 P.2d 759 (Alaska 1971), we examined the nature of contempt proceedings in general as well as appropriate procedural safeguards for such proceedings. In that case, we stated:

> At the outset, it should be determined by the trial judge, whether the alleged contemnor contests the assertion that he has the ability to comply with the court's order of child support. In the event the defendant makes no issue of his ability to comply, then the defendant can be imprisoned in order to compel compliance without the intervention of a jury trial. *On the other hand, if the defendant asserts that he lacks the ability to comply with the court's order of child support then he is entitled to a jury trial on this issue.*

*Id.* at 766 (emphasis supplied).

■ Jack asserts that the *Johansen* list of procedural safeguards for civil contempt cases like the one in this case was not intended to be exhaustive.[15] He argues that if the right to trial in such cases is to be given real meaning, the trial court must not be permitted to direct a verdict. Although we agree that *Johansen* left open the precise question raised by Jack, we also note that at the time May's counsel moved for a directed verdict, Jack's counsel did not voice the objection that the court lacked the authority to direct a verdict in this type of contempt proceeding. We therefore decline to reach the issue in this appeal.[16]

15. May argues that *Johansen* has already decided this issue, relying on the following passage from *Johansen:*

> Should this determination [of the defendant's ability to comply with the court order] be made without all criminal safeguards—with the exception of jury trial—even though incarceration hangs on the outcome? We believe that it should, subject to the following guidelines. . . ."

*Johansen,* 491 P.2d at 766. In *Otton v. Zaborac,* 525 P.2d 537, 538 n. 3 (Alaska 1974), however, we held that *Johansen* did not preclude the consideration of further procedural safeguards.

16. The question is important, and if upon remand further contempt proceedings are held

Nevertheless, we are of the view and hold that the superior court's entry of a directed verdict was erroneous. The superior court based its directed verdict on the fact that while gambling in the spring of 1980, Jack lost $10,000, money which the court believed should have been applied to his support arrearages. The principal question in civil contempt proceedings involving child support orders, however, is not whether the defendant once had the ability to comply with the support order but whether he presently has the ability to comply:

> The purpose of contempt proceedings for nonpayment of child support decrees is to coerce the defendant to pay money. It is not to punish him for past failure to pay.

*Id.*[17] The superior court did not relate Jack's $10,000 gambling spree to his financial situation at the time of trial. In fact, there was substantial evidence that Jack was in bad financial straits,[18] and fair minded jurors could have reached different conclusions on the issue of his ability to pay. *See Martinez v. Bullock,* 535 P.2d 1200 (Alaska 1975). Therefore, the motion for a directed verdict was improperly granted.[19]

REVERSED and REMANDED for further proceedings.

and the question is again presented, it is suggested that the superior court solicit amicus presentations from the office of the Attorney General as well as the Public Defender.

Regarding the rule that a point not raised below is deemed waived, see *Wickwire v. McFadden,* 633 P.2d 278, 281 n. 6 (Alaska 1981); *City of Whittier v. Whittier Fuel and Marine Corp.,* 577 P.2d 216, 225 (Alaska 1978); *Wetzler v. Wetzler,* 570 P.2d 741, 742 n.2 (Alaska 1977); *Bachner v. Rich,* 554 P.2d 430, 438 n. 6 (Alaska 1976); *King v. Petroleum Services Corp.,* 536 P.2d 116, 120–21 (Alaska 1975); *Padgett v. Theus,* 484 P.2d 697, 699–700 (Alaska 1971).

17. *See Sword v. Sword,* 399 Mich. 367, 249 N.W.2d 88, 98 (1976) (Lovin, J., concurring) ("A construction of 'sufficient ability' [a statutory term in the Michigan statute dealing with failure to pay child support] that took into account past misconduct would deny the premise that the contemnor may not be incarcerated if he does not have the ability to comply with the court's order. Construing 'sufficient ability' to mean 'present ability to pay' establishes a standard consonant with that premise and the concept that the civil con-

temnor carries the keys of the prison in his own pocket.").

18. Jack's sole income at the time of trial was the money he made selling flowers from bar to bar. This income was uncertain and not very substantial. He had borrowed significant amounts of money and was, according to his testimony, $65,000 in debt. Many of the expenditures noted by May were paid by a credit card which has now been terminated. His travels were apparently partly financed by money borrowed from friends and by credit card. Because Jack was unable to pay his own attorney's fees, the court appointed his attorney.

19. Our disposition of this issue makes it unnecessary to address Jack's other specifications of error concerning whether a unanimous verdict was required before he could be found in contempt, whether it was error to allow him to appear at the contempt trial dressed in prison garb, and whether Judge Carlson should have disqualified himself from presiding over the contempt trial. In regard to this latter point, we note no challenge was made to Judge Carlson's sitting on the case at the time of trial.