Daniel JOHANSEN, Appellant,

v.

STATE of Alaska, Appellee.

No. 1309.

Supreme Court of Alaska.

Nov. 30, 1971.

Robert J. Doyle, John S. Hedland, Meredith A. Wagstaff, and Robert Kocsis, Alaska Legal Services, Anchorage, for appellant.

G. Kent Edwards, Atty. Gen., Juneau, Sanford M. Gibbs, Asst. Atty. Gen., Wayne A. Ross, Court Trustee, Anchorage, for appellee.

Before BONEY, C. J., and DIMOND, RABINOWITZ, CONNOR and ERWIN, JJ.

## OPINION

DIMOND, Justice.

Appellant's wife divorced him in May 1966. The divorce decree required appellant to pay $100 a month for the support of his two children.

Between the date of the divorce and April 1970, appellant paid only $148 in child support. A bench warrant was issued by the superior court, and appellant was arrested and brought before the court to show cause why he should not be held in contempt of court for failure to pay child support as required by the divorce decree.

Following the hearing in May 1970, the superior court entered an order finding that appellant was in arrears in his child support obligation in the amount of $4,876. The court further found appellant in "civil contempt" and sentenced him to serve 60 day in jail. Commencement of the sentence was deferred until October 1, 1970. The court also provided that the sentence "may be further deferred if a payment on child support obligation herein is made by Daniel Johansen commensurate with his in-

come or if, at that time, it can be shown that Daniel Johansen has no money to pay child support through no fault of his own."

From this contempt order an appeal has been taken. Appellant argues (1) that the contempt proceeding, although denominated as civil in nature, was in reality criminal, and that he was denied the constitutional safeguards guaranteed to him by the Alaska Constitution in criminal proceedings; (2) that there was no evidence before the superior court upon which to base a finding of contempt; and (3) that the court's denial of appellant's motion for a change of venue from Anchorage to Dillingham was an abuse of discretion. The case raises two additional points which we shall pass upon. They concern the possibility that this appeal has been rendered moot by events occurring after the entry of judgment in the superior court and the procedure to be utilized by a court to bring a similarly situated defendant before it.

*Mootness*

The circumstances which might be thought to render this case moot arose after the briefs were filed. Hence, appellee's failure to raise the issue will not preclude our consideration of it. Courts have the power, as a matter of sound judicial policy, to dismiss moot appeals. *See, e. g.,* Moore v. Smith, 160 Kan. 167, 160 P.2d 675 (1945). This rule should apply even when the mootness issue is not raised by the appellee, if the reason is because the events causing the appeal to be mooted occur after the briefs were filed.

The appellant was not imprisoned on October 1, 1970, or at any time thereafter as a result of the order quoted above. Further, on October 6, 1970, the appellant made a payment of $750 to the court trustee. The court trustee has taken no further action in connection with this case. Under these circumstances, it may be thought that the appellant has satisfied the decree and the case is moot.

We decline to reach this result for two reasons. First, a careful reading

of the lower court's order indicates that the events described above have not necessarily relieved the defendant of the threat of incarceration based on the order itself. The key clause says only that "commencement of said sentence *may* be further deferred if a payment on child support obligation herein is made by Daniel Johansen commensurate with his income." (emphasis added.) That appellant's sentence apparently has been deferred to this date does not necessarily mean that at some future time the appellant might not be incarcerated on the basis of this order alone. Second, this case presents an issue which is "capable of repetition yet evading review"; that is, an issue which falls within the public interests exception to the mootness doctrine. In re G.M.B., 483 P.2d 1006, 1008 (Alaska 1971); quoting Southern Pacific Terminal Company v. I. C. C., 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911). *See also* Deaconess Hospital v. Washington State Highway Commission, 66 Wash.2d 378, 403 P.2d 54, 67–68 (1965). The imposition of conditional jail sentence in child support contempt cases is a question of broad public interest because of the great number and the importance of such cases, and it is likely to recur. In these circumstances we have discretion to entertain such cases so that important public questions may be decided without delay by this court.

*Procedural Safeguards in Contempt Proceedings in Nonsupport Cases.*

Appellant argued at trial that the proceedings contained criminal elements and that he was entitled to various criminal procedural safeguards. The court ruled that the proceedings were for civil contempt and therefore the criminal rules were inapplicable. The issue presented—whether a contempt hearing to compel compliance with the child support order is a civil or criminal proceeding—is one of first impression in this state.

■ Recourse to statutory law is helpful but not dispositive of the issue.[1] However, the statutes do furnish some guidance. AS 09.50.010 speaks of the acts or omissions which constitute contempt. Subdivision (5) of that section, with which we are concerned here, provides that it is a contempt of the authority of the court to disobey a lawful judgment, order, or process of the court. AS 09.50.030 further provides:

> A person who is charged with contempt of court not committed in the presence of the court, where the act or thing so charged as a contempt is of such nature as to constitute also a criminal offense under a statute of the United States or a law of this state, has a right to jury trial.

AS 11.35.010 makes wilful failure without lawful excuse to support a child a crime.[2] Thus, it is clear that, for purposes of the right to a jury trial, our statutes classify indirect contempts for nonsupport, such as that alleged in the case at bar, as a crime and a jury trial is available. Appellant was not afforded the right to jury trial in the case at bar. On this basis alone, the superior court's order of contempt must be reversed.

Our conclusion concerning appellant's right to a jury trial, however, does not dispose of this appeal, for here appellant seeks the full panoply of criminal procedural protections, and we must decide whether he and others in his position should receive them. Our statutes speak no further on this subject. It is necessary, therefore, to consider in some detail the contours of contempt doctrine to determine the proper

1. Even the location of the contempt laws in the state statutes permits ambiguous inferences. The contempt provisions are found in AS 09.50.010–09.50.060, part of the Code of Civil Procedure, but these sections are specifically made applicable to "criminal actions" by AS 12.80.010, part of the Code of Criminal Procedure.

2. Although AS 11.35.010 does not specifically concern the duty to support minor children after divorce, we find that AS 11.35.010 includes a person's postdivorce obligation to support as well as the obligation which exists during marriage.

scope of courts' powers and defendants' rights in contempt proceedings for non-support.

As we noted recently in State v. Browder,[3] contempt was originally regarded as a crime, punishable by criminal sanctions. Whether this was because "[t]he original law of contempt embraced only what is now known of as criminal contempt,"[4] or because every contempt inevitably contains an element of disrespect for the authority of government (one of the hallmarks of criminal contempt) is not clear. It is certain, however, that "the genesis of modern day contempt was a crime."[5]

The common law soon began to categorize contempts, and one of the earliest distinctions was between criminal and civil contempt.[6] The exact development of the distinction is not clear, although it has been traced at least[7] as far back as the 18th century.[8] Significantly, the earliest explications of civil contempt evidence little agreement as to exactly what distinguished it from criminal contempt.[9]

Halsbury reported that older English law distinguished criminal contempts by their procedural implementation as much as by any innate substantive dif-ferences which might have existed between them and other offenses.[10]

Nonetheless, that there is a distinction between civil and criminal contempt appears to have become firmly established, both in England and in this country,[11] by the late 19th century.[12] It now remains to explore what that distinction is, and whether it is based on sound reasoning.

The leading case is Gompers v. Buck's Stove & Range Company,[13] where the United States Supreme Court held:

> It is not the fact of punishment, but rather its character and purpose, that often serve to distinguish between the two classes of cases. If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court.[14]

These polar concepts—"remedial" (or "coercive") v. "punitive"—seem clear enough, and, indeed, this distinction has been "widely accepted."[15] Yet even Gompers noted that the distinction was far from absolute:

> Contempts are neither wholly civil nor altogether criminal. . . . It is true

3. 486 P.2d 925 (Alaska 1971).

4. Id. at 933, quoting R. Goldfarb, The Contempt Power 11–12 (1963).

5. 486 P.2d at 933.

6. R. Goldfarb, The Contempt Power 49 (1963); Wright, Byrne, Haakh, Westbrook and Wheat, Civil and Criminal Contempt in the Federal Courts, 17 F.R.D. 167 (1955).

7. Beale, Contempt of Court, Criminal and Civil, 21 Harv.L.Rev. 161, 169 (1908), indicates that civil contempt was utilized as early as the time of Richard III. See also Comment, The Coercive Function of Civil Contempt, 33 U.Chi.L.Rev. 120, 120–21 & n. 3 (1965).

8. Comment, Civil and Criminal Contempt in the Federal Courts, 57 Yale L.J. 83, 90 & n. 49 (1947).

9. In attempting to enforce his decrees, the chancellor could commit a recalcitrant party "to prison till he obey." 27 Henry VIII 15. "This imprisonment was by no means a punishment, but was merely to secure obedience to the writ of the king." Beale, note 7 supra, at 170. This is now referred to as the "classic example" of civil contempt: imprisonment for purposes of coercion, not punishment. See Comment, note 7 supra, at 120–22.

10. Goldfarb, note 6 supra, at 49. See 7 Halsbury's Laws of England (Contempt of Court) (2d ed.).

11. Beale, note 7, supra, at 168–69. The federal courts in this country were somewhat slower to accept it than the state courts. Comment, note 8 supra, at n. 49.

12. Beale, note 7 supra, at 168–69.

13. 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911).

14. Id. at 441, 31 S.Ct. at 498, 55 L.Ed. at 806.

15. Moscovitz, Contempt of Injunctions, Civil and Criminal, 43 Colum.L.Rev. 780, 786 (1943), citing cases from 31 jurisdictions.

that punishment by imprisonment may be remedial as well as punitive . . .

. . . . . . . . . .

It is true that either form of imprisonment has also an incidental effect. For if the case is civil and the punishment is purely remedial, there is also a vindiction of the court's authority. On the other hand, if the proceeding is for criminal contempt and the imprisonment is solely punitive, to vindicate the authority of the law, the complainant may also derive some incidental benefit from the fact that such punishment tends to prevent repetition of the disobedience.[16]

Despite this weakness, the main test remains that suggested by the *Gompers* case: The character and purpose of the punishment serve to distinguish civil from criminal contempt. This remedial-punitive distinction is not perfectly sharp. We must now decide whether, whatever its faults, the remedial-punitive distinction is sharp enough to justify complete procedural cleavage between civil and criminal contempt.

Elements of punitive as well as remedial punishment are almost invariably present in every civil contempt.[17] If coercive imprisonment is imposed in order to effectu-

ate compliance with a court order and thus aid a private litigant (remedial punishment), it nonetheless also has the effect of deterring contemptuous conduct in the future[18] and of punishing the contemnor for his act of noncompliance[19]—both of which are clearly attributes of criminal sanctions. This overlapping is tolerable if in civil contempt cases the court provides that imprisonment is conditional upon the defendant's continued refusal to comply with the court's order. This step, which insures that the defendant indeed does "carry the keys of [his] prison in [his] own pockets,"[20] assuming he has the ability to comply,[21] would be sufficient to establish the coercive aspect of the imprisonment as its dominant one. Theoretically, once confronted with the reality and imminence of a stay in jail as a result of his noncompliance, the contemnor could immediately purge himself and avoid incarceration completely. If he did this, punishment would not be present at all, and deterrence would not be nearly as significant as the coercive (hence remedial) aspects of the proceedings. Under these circumstances, the characterization of the action as civil is not doctrinally objectionable, and the civil-criminal distinction is reasonably clear.[22]

---

16. 221 U.S. at 441 and 443, 31 S.Ct. at 498, 55 L.Ed. at 806. An earlier commentator saw the blurred line between civil and criminal incarceration perhaps more clearly:

I venture to say that every 'civil' contempt whose contumacy is carried to the point at which the contemnor may be committed is a 'criminal' contempt as well. . . .
Nelles, The Summary Power to Punish for Contempt, 31 Colum.L.Rev. 956, 961 (1931).

17. *See* Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 443, 31 S.Ct. 492, 55 L.Ed. 797, 806 (1911) ; Comment, note 7 *supra*, at 124.

18. *Cf.* Comment, note 7 *supra*, at 124.

19. [T]he possibility that coercive relief may become actual punishment is necessarily present in every civil contempt proceeding.
Comment, note 8 *supra*, at 105. *See also* Goldfarb, note 6 *supra*, at 61.

20. In re Nevitt, 117 F. 448, 461 (8th Cir. 1902). For a scathing criticism of this "rationalization [which] has since become a staple in the rhetoric of contempt," see Goldfarb, note 6 *supra*, at 58–61.

21. *See* text accompanying notes 25–26 *infra*.

22. There are two disadvantages to the character-of-the punishment test which affect primarily the trial courts and to which we call attention here. The first is that punishment is not determined until the end of the proceeding, whereas the need for classification exists from the beginning. Trial courts may overcome this in most instances by announcing at the outset the goal of the contempt action, specifying whether the action is designed primarily to vindicate the court's authority or to coerce compliance with one of its orders for the benefit of a third party. The second is that the alleged contemnor, at the time of his wrongful act, has no

There is a more serious problem inherent in the civil contempt doctrine. Although imprisonment—indeed, potentially unlimited incarceration[23]—is at stake, the civil contempt defendant is afforded no more procedural protection than the ordinary civil litigant. This is because of the belief that civil contemnors do not need criminal procedural safeguards since they are not placed under the criminal sanction of a fixed sentence; that is, they "carry the keys of their prison in their own pockets."[24] However, this may not be true:

> Both compliance and inability to comply are complete defenses to coercive imprisonment proceedings. The contemnor may have already complied or be incapable of doing so, *yet the determination of these facts is made without criminal safeguards even though imprisonment hinges on the outcome of that determination.*[25]

A better rationale for denying procedural safeguards rests on the position of the plaintiff. In criminal contempt, where the government initiates the action, the granting of procedural safeguards does not conflict with the rights of any individual. "But granting additional safeguards to the defendant in a civil contempt proceeding is directly opposed to the interests of the complainant to whom the defendant owes a duty by reason of a prior judicial decree."[26] If this is so, where should the balance be struck?

The competing interests are strong in the instant case. Defendant, faced with incarceration, has an interest in receiving those procedural protections which insure that he has been accorded a fair trial. Defendant's children have an interest in receiving support for the sustenance of life. Defendant's former wife, now charged with the responsibility of raising the children, needs contributions from the children's father in order to meet her responsibility. Further, the interests of both children and wife are heightened in that they seek enforcement of a prior judicial decree. The state has an interest in the welfare of the children as the ultimate source of their support in the event that their parents fail them.

In these circumstances we find it appropriate to delineate the rights of the parties in such a way that all legitimate interests will be protected as fully as possible, departing from traditional contempt doctrine in those areas where we have found it to be deficient or where strict adherence to it would not lead to the soundest

---

way of knowing whether he has committed a civil or criminal contempt or what his sanction will be. Goldfarb, note 7 *supra*, at 66. We deem this disadvantage outweighed by the benefits of an otherwise workable classificatory scheme and mitigated, for purposes of due process notice requirements, by the trial court's announcement, at the beginning of the proceedings, of the purpose of any punishment imposed.

23. *See* Uphaus v. Wyman, 364 U.S. 388, 397–400, 81 S.Ct. 153, 5 L.Ed.2d 148, 154–156 (1960) (Black, J., dissenting); Goldfarb, note 6 *supra*, at 61. The duration of civil incarceration (e. g., to compel testimony "on occasion has lasted much longer than punishment in more grievious criminal contempt cases." *Id.* Justice Black, in *Uphaus, supra,* cites one example, "of many" where a civil contempt defendant in England died in prison after a period of years, having been jailed for refusing to testify.

AS 09.50.050 is potentially open-ended. It provides:

> When the contempt consists of the omission or refusal to perform an act which is yet in the power of the defendant to perform, he may be imprisoned *until he has performed it.* (emphasis added.)

24. In re Nevitt, 117 F. 448, 461 (8th Cir. 1902). *See also* Uphaus v. Wyman, 364 U.S. 388, 403–404, 81 S.Ct. 153, 5 L.Ed. 2d 148, 157 (1960) (Douglas, J., dissenting on other grounds).

25. Comment, note 7 *supra*, at 125 (footnote omitted) (emphasis added). *See also* Comment, note 8 *supra*, at 105:

> Unless his refusal to obey an order of the court is based upon sheer stubbornness in which event the metaphor is probably appropriate, he may not actually *possess* the 'keys to his prison.'

26. Comment, note 7 *supra*, at 125.

rule of law in terms of all the parties' interests.

■■ The purpose of contempt proceedings for nonpayment of child support decrees is to coerce the defendant to pay money. It is not to punish him for his past failure to pay.[27] What we are dealing with here is the question of imprisonment to compel performance of an act. In this regard AS 09.50.050 states:

> When the contempt consists of the omission or refusal to perform an act which is yet in the power of the defendant to perform, he may be imprisoned until he has performed it.

Thus, it is necessary to determine whether defendant has the resources with which to satisfy the court order, that is, whether he has the ability to comply with an order of support. Should this determination be made without all criminal safeguards—with the exception of jury trial—even though incarceration hangs on the outcome? We believe that it should, subject to the following guidelines, because of the relative positions of the parties. At the outset, it should be determined by the trial judge whether the alleged contemnor contests the assertion that he has the ability to comply with the court's order of child support. In the event the defendant makes no issue of his ability to comply, then the defendant can be imprisoned in order to compel compliance without the intervention of a jury trial. On the other hand, if the defendant asserts that he lacks the ability to comply

with the court's order of child support, then he is entitled to a jury trial on this issue.

■ At the contempt trial, the burden of proving noncompliance, by a preponderance of the evidence, with the court's order should be on the plaintiff, who initiates the action. Since all payments in child support cases in Alaska are made through the office of the court trustee, pursuant to AS 09.55.210(5) and Civil Rule 67(b), proof of noncompliance should be a simple matter. In almost all child support contempt cases, the crucial issue will concern the defendant's *ability to comply*. This was the situation in the instant case. The burden of proof in this respect should remain with the defendant.[28] This is where it presently rests, in this state[29] and in other jurisdictions;[30] such allocation of the burden of proof is appropriate. Defendant is already under a court order to pay a certain amount of money; presumably the prior adjudication was based on evidence that the amount fixed was fair and in proportion to defendant's ability to pay.[31] Further, putting the burden on the plaintiff (of proving defendant's ability to pay) seems unfair. Defendant, as a father, is under a general duty to support his children. AS 11.35.010. He is further under a specific obligation to pay a certain sum by virtue of the court order. By the time these cases reach trial stage, the father usually has failed to fulfill these obligations for a considerable period of time. He should be required to present the rea-

27. Of course, the prosecuting authority can always seek conviction for violation of AS 11.35.010, or initiate proceedings for criminal contempt under AS 09.-50.010(5) for past wilful flouting of the court's authority, but either of these occurrences would initiate a criminal proceeding in which defendant would have to be afforded full criminal procedural safeguards. This distinction should be made clear at the outset of the contempt nonsupport proceedings.

28. That is, defendant must prove his inability to comply with the court order. Put in procedural terms, inability to comply is an affirmative defense.

29. *E. g.*, Houger v. Houger, 449 P.2d 766, 770 (Alaska 1969).

30. *E. g.*, Bailey v. Bailey, 77 S.D. 546, 95 N.W.2d 533 (1959); Roper v. Roper, 242 Ky. 658, 47 S.W.2d 517 (1932). 2 W. Nelson, Divorce and Annulment § 16.25a, at 440–41 (2d ed. 1961 rev.).

31. It is no answer that the prior adjudication was then or is now incorrect. Defendant has already had one day in court on this issue; that he did not contest the divorce or the amount of support requested cannot be charged against his children. Further, he can always seek modification of the support order. AS 09.55.220.

sons, if there are any, for his failure to meet his legal obligation to support his children. Further, the particular facts regarding his inability to pay will be known to him, whereas his former wife and his children generally will know little of his financial situation or earning capacity.[32]

■ The shifting of the burden of proof entails a partial change of the ordinary standard employed in criminal cases. But this is still advantageous to both parties. The defendant's protection increases as the burden of proof is shifted. He needs only to show by a preponderance of the evidence that he is unable to pay. Once he has met this burden, incarceration, as a coercive method, serves no useful purpose. At the same time the interest of the complainants in receiving money which defendant is able to pay, is protected under this approach.

It is now evident that traditional contempt doctrine cannot satisfactorily answer whether child support contempt hearings are "criminal" or "civil" in nature. We have, instead, looked to a balancing of the parties' interests to determine what procedure should be followed in such cases. We have drawn from both sides of the law. We have found a jury trial not only mandated by our statutes but warranted as a procedural protection to the defendant facing incarceration. On the other hand, we have left inability to comply as an affirmative defense, thereby keeping the burden of proof on the central issue on defendant. Doubtless, further procedural questions will arise in future cases. We shall continue to weigh the interests as we have done here. All we do today is attempt to delineate the procedural aspects of contempt proceedings in nonsupport cases where the purpose is to coerce the defendant's performance of his obligation.

*Sufficiency of the Evidence*

AS 09.50.010(5) provides that it is a contempt of the authority of the court to disobey a lawful judgment, order, or process of the court. Under this statute, the purpose of the contempt proceeding in this case and a resulting sentence of imprisonment was either to coerce the appellant into paying support money for his children or to punish him for his past failure to pay, or both. The question is whether the evidence was sufficient to justify finding appellant in contempt and sentencing him to a term of imprisonment.

■ Disobedience of a lawful order of the court connotes more than the mere failure to comply with such order. The word "disobey" has the connotation of wilfully failing to comply, without some lawful or reasonable excuse for not complying.[33] If such an excuse does exist and it is established, there can be no contempt of the authority of the court.

Appellant is an Alaskan Native born in the Native village of Ekuk and raised in the nearby Native fishing village of Dillingham. In appellant's brief, it is stated that he is uneducated. Appellant's experience is sharply limited. His whole life, with the exception of four years in the military, has been spent in the village. His only occupation has been fishing, except for some very limited experience as a waiter in Dillingham working a few nights a month as work was available. He has been trained for no other occupation but fishing.

32. Although the United States Supreme Court has held that the "comparative convenience" test is insufficient by itself to justify shifting the burden of proof in criminal cases, Tot v. United States, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943), leaving inability to comply as an affirmative defense is justified by our finding that child support contempt is not wholly a criminal proceeding and by the strong policy reasons discussed above in the text.

33. This is not unlike the situation in a criminal case where we have held that conduct cannot be criminal unless it is shown that the one charged with criminal conduct had criminal intent, that is, an awareness or consciousness of some wrongdoing. Speidel v. State, 460 P.2d 77, 78, 80 (Alaska 1969).

Appellant's last good fishing season, when he cleared $3,200, was in 1965, before his divorce. Since that time he has cleared no more than $700 in any year because of poor fishing conditions. Appellant has been and is heavily in debt to a local cannery in Dillingham. In addition to other sums owed the cannery, appellant owes about $7,200 on his fishing vessel.

Appellant has made attempts to find other employment. But he was unsuccessful, principally, it appears, because prospective employers would not hire fishermen. Appellant testified that he could not quit fishing because he owes so much money to the cannery. He did not know of any way of making more money than as operator of a fishing vessel. In the 1969 fishing season, the year prior to the hearing on this matter, appellant testified that he had gone "in the red." In that year he went deeper in debt to the cannery. Appellant testified that he might have gotten a full time job with Wien Consolidated Airlines in Dillingham if he had given up fishing as his occupation, but that he could not be certain of this. From his testimony, it appears that appellant was continuing his occupation as a fisherman while waiting for a good fishing season to make up his losses and make a profit.

At the conclusion of the hearing, the judge stated that he could not contemplate issuing a judgment which would in effect order the appellant to go somewhere else to live and work at another job. But then the judge reversed his position by stating that appellant had remained in a depressed area year after year hoping for the big strike that had never come, that he ought not to stay in Dillingham, and that he was in contempt of court. The question here is whether one may be required to change his place of residence as a condition of not being held in contempt in a case of this type.

 In these circumstances, we cannot agree with the trial judge's suggestion that appellant leave his home in Dillingham and seek employment in an urban community, such as the city of Anchorage. There is no indication from the record that such a move would hold a promise of success within appellant's inherent but unexercised capabilities. Rather, it seems that it would be a gamble, based on little more than hope, that an untrained person could earn more in an urban environment doing an undetermined job than he could in his home locality at his life-long occupation.

We need not close our eyes to the serious problem of unemployment in the city of Anchorage which is more serious for the unskilled. Further, our recent decision in Alvarado v. State, 486 P.2d 891 (Alaska 1971), discusses in detail the wide ranges of difference between life in rural Alaska and life in the city. We found them to be "vastly dissimilar," noting an "order of differences which distinguishes one culture from another." [34]

We hesitate now to adopt a rule allowing a superior court to force a man to move from one community to another, in the process renouncing his life-long occupation to seek an undetermined one, on the penalty of being found in contempt for failure to do so. In short, leaving Dillingham to seek employment elsewhere would be outside the reasonable effort we require of a father in such cases.

We are remanding this case for a trial before a jury. We recognize it is within the function of the jury to make a factual determination as to whether appellant has presented a sufficient excuse for not complying with the order of child support. But we are determining as a matter of law, rather than leaving the question to the jury, that in the circumstances of this case, it is not contempt for a father to refuse to leave his village and seek more promising work in the city.

 On the other hand, we hold there is a jury question as to the existence of a lawful excuse for non-compliance with

34. 486 P.2d 891, 900 (Alaska 1971).

the child support order while the appellant resides in Dillingham. In Houger v. Houger [35] we spoke of a father's primary and continuing obligation to support his children and of the fact that the inability of a father to engage in his chosen trade may not excuse him from that obligation. We said:

> But there may be other kinds of work which appellee could engage in despite any disability he may have. He should be required to seek such other work with respect to his obligation to support his children even though such work may not appeal to him, because there is no room for professional or occupational pride where the duty of child support is involved.[36]

We adhere to *Houger* and hold that in a contempt action such as we have here, the father will not be permitted to succeed on the defense of having a legitimate reason or excuse for not complying with an order of child support where he has not made a reasonable effort to employ his earning capacity in directions other than the one he has chosen as his chief means of livelihood.[37]

In this situation a jury question is involved. Considering the evidence of appellant's life-long vocation of being a fisherman, his indebtedness to the local cannery, the existence of other type of employment in Dillingham, and his attempts to seek other such employment, we find there can be a difference of opinion among reasonable men [38] as to whether appellant did establish by preponderance of the evidence a legitimate and reasonable excuse for fail-

ure to comply with the order of child support.

*Change of Venue*

Appellant's final point on appeal is that the superior court erred in refusing to grant a motion for a change of venue from Anchorage to Dillingham.[39] We need not reach the merits of this argument. Even assuming, *arguendo*, that error was committed, it could have been no more than harmless error. *See* Love v. State, 457 P.2d 622, 631 (Alaska 1969).

Appellant sought a change of venue to Dillingham for purposes of calling witnesses who could testify to "the employment potential, the fishing season, and the conduct and good faith of the defendant." Appellant's defense to the contempt charge was that he had no money with which to make support payments, that he had worked hard to earn money, and that conditions in Dillingham were such that he could earn very little money. Appellant sought the change of venue to Dillingham so that he could introduce witnesses to testify to these facts.

There was, however, no controversy regarding these facts. The court accepted them fully as to appellant's financial condition, as to his good faith attempts to earn money, and as to the adverse economic conditions in Dillingham. In short, the trial judge appears to have been fully convinced by appellant's testimony on these matters. Further testimony would have been at best cumulative.. In these circumstances an incorrect ruling that such testi-

---

35. 449 P.2d 766, 770 (Alaska 1969).

36. *Id.*

37. *See* Hopp v. Hopp, 279 Minn. 170, 156 N.W.2d 212, 217–218 (1968) ; 2 W. Nelson, Divorce and Annulment § 16.25, at 436–37 (2d ed. 1961 rev.).

38. Taylor v. Interior Enterprises, 471 P.2d 405, 407 (Alaska 1970).

39. The motion was made pursuant to AS 22.10.040, which provides:
 Change of venue. The superior court in which the action is pending may
 change the place of trial in an action from one place to another place in the same judicial district or to a designated place in another judicial district for any of the following reasons:
 
 . . . . .
 
 (2) when the convenience of witnesses and the ends of justice would be promoted by the change;
 
 . . . . .

mony is inadmissible will be found to be harmless error under Alaska Civil Rule 61. *See* Palfy v. Hepp, 448 P.2d 310, 311 (Alaska 1968); Mallonee v. Finch, 413 P.2d 159, 164 (Alaska 1966). The court's denial of change of venue, which appellant claims had the effect of keeping out certain testimony, is exactly analogous here to a ruling on admissibility of testimony at trial. It should be treated in the same way. Thus, even if error was committed, it must be viewed as harmless.

We note under this issue, however, the recent enactment of SLA 1971, Chapter 126 (effective September 2, 1971), which relaxes Alaska's venue statutes and is bottomed on an "intent . . . to make the administration of justice more accessible to people of the rural areas of the state."[40]

*Id.,* section 3. It can be expected that courts hearing nonsupport contempt cases in the future may choose in some cases to make use of the discretionary authority vested in them by the new law and will grant changes of venue, and thereby obviate claims of error such as the present one.

*Use of Bench Warrant*

The present action was initiated by the court trustee who, after notifying Johansen of his noncompliance, obtained simultaneously a show cause order and a bench warrant for appellant's arrest. While such methods may have been appropriate at the time the court trustee acted, we note that recent amendments to the Criminal Rules would preclude the use of bench warrant and arrest as a means of bringing child support contempt defendants into court, absent a showing that they have refused to appear and answer.

Civil Rule 90(b), which deals with indirect contempts, provides that upon a proper showing by ex parte motion supported by affidavits, "the court shall *either* order the accused party to show cause at some reasonable time . . . why he should not be punished for the alleged contempt, *or* shall issue a bench warrant for the arrest of such party." (emphasis added.) In determining which of these approaches should be used, Criminal Rule 4[41] is helpful. Subdivision (1) of Criminal Rule 4(a) now provides in part:

> (a) . . . a warrant for the arrest of the defendant shall issue . . . if the person taking the complaint has reason to believe that the defendant will not appear in response to a summons.

And Rule 4(a) (2) specifies that

> (a) summons instead of a warrant should issue if the person taking the complaint has reason to believe that the defendant will appear in response thereto . . . .

This specific criminal rule controls the court's authority under Civil Rule 90(b) to use either a show cause order or a bench warrant, and, moreover, makes it clear that Civil Rule 90(b) authorizes the use of a bench warrant for contempt only if there is a reason to believe that the defendant will not appear in response to the show cause order.

The judgment of contempt is reversed and the case is remanded to the superior court for further proceedings not inconsistent with this opinion.

---

40. SLA 1971, ch. 126, § 1 provides in relevant part:
 [A] trial and any precedent or antecedent hearings in an action shall be conducted in an election district within the judicial district at a location which would best serve the convenience of the parties and witnesses.

41. The criminal rules are applicable here for a number of reasons. A criminal sanction, incarceration, is a possible outcome of these proceedings. A criminal procedural device, arrest, is being used. *See generally* discussion at 766–767 *supra*.