**Joan GWYNN, Appellant,**

v.

**Robert Wayne GWYNN, Appellee.**

**No. 2179.**

Supreme Court of Alaska.

Jan. 20, 1975.

Wilson A. Rice, Anchorage, for appellant.

No appearance by appellee.

Before RABINOWITZ, C. J., and CONNOR, ERWIN, BOOCHEVER, and FITZGERALD, JJ.

## OPINION

ERWIN, Justice.

On June 26, 1970, appellant was awarded a default divorce from Robert Gwynn and was granted custody of the three minor children of the marriage. In November, 1972, the custody order was modified and custody of two of the children was awarded to their father, who took them to Montana.

The evidence shows that for a period of eight months after the children were taken by appellee, appellant was neither notified nor aware of the whereabouts of these two children. Then, in July, 1973, she received a series of long-distance phone calls from them complaining of mistreatment by their father and paternal grandmother which included physical abuse and lack of supervision. They also related that their father was considering moving to Australia where the children believed they would never again see their mother.

After three days of such phone calls appellant wired money to an airport in Montana, enabling the children to fly to her home in Anchorage on July 9, 1973. On July 16, 1973, appellant was ordered to show cause why she should not be held in contempt of the custody order, and was further required to produce the two children before the superior court.

At the contempt hearing, having surrendered custody of the children as ordered, appellant requested a jury trial. The court below denied the request, deeming that the proceeding involved a civil contempt affecting the rights of the parties rather than a criminal contempt affecting the powers of the court. The court subsequently found appellant to be in contempt and imposed a fine of $200 and a jail sentence of thirty days. Both the fine and the jail sentence were suspended on condition that appellant not perform similar acts in the future. Appellant appeals from the contempt order, alleging error in the court's denial of a jury trial.

Appellant's actions brought her within AS 09.50.010(5) which defines as an act of contempt " . . . [the] disobedience of a lawful judgment, order, or process of the court . . . ." She was therefore sub-

ject to imprisonment under AS 09.50.020 [1] if her actions defeated or prejudiced the rights of the other party to the action, Robert Gwynn. It appears that the trial judge so characterized the nature of her alleged contempt.

We have held that an accused is entitled to a jury trial upon demand in any criminal prosecution, and have stated that a criminal prosecution for such purposes includes "any offense a direct penalty for which may be incarceration in a jail or penal institution." Baker v. City of Fairbanks, 471 P.2d 386, 401, 402 (Alaska 1970). Applying *Baker's* definition of a criminal prosecution, we held that the right to trial by jury extended to direct criminal contempts. State v. Browder, 486 P.2d 925, 937 (Alaska 1971).[2] In Johansen v. State, 491 P.2d 759 (Alaska 1971), we noted that even those contempts which are traditionally characterized as civil contempts almost invariably include punitive as well as remedial elements.[3] We held that an alleged contemnor faced with a possible deprivation of liberty in civil contempt proceedings for non-support must be afforded a jury trial on the factual issue of his willful non-compliance with the court's directive.[4] In Otton v. Zaborac, 525 P.2d 537 (Alaska 1974), we held that due process also required that a purported indigent contemnor was entitled to appointed counsel where a civil contempt was tried to a jury.

Because the contempt with which appellant was charged constitutes an offense with a possible jail sentence, the proceedings here fall squarely within our definition of a criminal prosecution in *Baker, supra*. Furthermore, while the alleged contempt is an indirect one, as was the contempt treated in *Johansen*, the rationale of *Browder*, which involved a direct criminal contempt, is applicable. We stated in *Browder* that

. . . fundamental fairness requires that no one individual should be permitted to act as prosecutor, trier of fact, and judge in the same proceeding.[5]

There is similar cause for concern where a judge may, as was done here, summarily convict and imprison for a past violation (as opposed to a continuing violation) of an order of his own creation.

The *Browder, Johansen* and *Otton* decisions concerned contempt findings with strongly punitive overtones, in contrast to proceedings involving the remedial use of contempt solely to compel the contemnor to correct his conduct or to perform his obligations.[6] The effect of these decisions is to afford certain basic procedural protections to those threatened with incarceration for such contempts.

At the time of appellant's contempt hearing, no remedial action to correct her conduct remained available to the court. The children brought to Anchorage by appellant

1. AS 09.50.020 provides:
   A person who is guilty of contempt is punishable by fine of not more than $300 or by imprisonment for not more than six months. However, when the contempt is one mentioned in § 10(3)–(12) of this chapter, or in an action before a magistrate, the person is punishable by a fine of not more than $100 unless it appears that a right or remedy of a party to an action or proceeding was defeated or prejudiced by the contempt, in which case the penalty shall be as prescribed for contempts described in § 10(1) and (2) of this chapter.

2. We noted in *Browder* that a direct criminal contempt was punishable by a fine up to $300 or incarceration up to six months. 486 P.2d at 933.

3. 491 P.2d at 764.

4. *Id.* 491 P.2d at 766, 767.

5. 486 P.2d at 939.

6. It is crucial to note that under *Johansen* a showing by the alleged contemnor of a legal excuse for noncompliance (in that case, inability to comply was recognized as such an affirmative defense) would demonstrate that the subsequent imposition of a jail sentence could only be punitive rather than remedial, for once compliance is so excused, incarceration can no longer be said to have any coercive justification. Where confinement cannot serve to accomplish the remedial object sought, or where there is no direct remedial objective left to be achieved, any incarceration—even when designated civil in nature—takes on a clearly punitive character. This possibility of punitive sanction gives rise to the need for jury trial as a procedural safeguard.

had been surrendered to the court and appellant had ceased acting contrary to the court's authority. Since appellee's right to custody had been satisfied, the major remaining interest to be protected by sentencing the appellant was the vindication of the authority of the court. The essential nature and justification for the sentence here imposed is thus punitive.

We recognized that the court below may well have intended merely to coerce future compliance with its custody order. We do not, however, believe that by suspending sentence the trial court has in any way obviated the punitive nature of the sentence[7] or the policies requiring a jury as fact finder. If the court was empowered to summarily punish by imposing a jail sentence and suspending it, it could likewise have required appellant to serve the sentence imposed. Furthermore, the court would be free to reinstate its suspended sentence upon a future summary finding that appellant had committed a similar contumacious act.

In order for conduct to constitute a contempt, it must be willfully contumacious. Johansen v. State, 491 P.2d 759, 767 (Alaska 1971); State v. Browder, 486 P.2d 925, 943 (Alaska 1971). We stated in *Browder* that an act of contempt is "done voluntarily and intentionally, that is, with the intent to disobey or disregard the law."[8] The particular facts of this case raise a substantial question as to whether appellant's conduct was willfully disobedient. In conformity with the procedures outlined in *Johansen,* once the moving party has established appellant's non-compliance with the court's order, appellant is entitled to a jury trial if she raises such a factual issue in her defense.

We do not here suggest that all civil contempts involving possible incarceration make a jury trial available to the defendant. A contemnor may, for example, be summarily confined in order to compel performance of an act which he is capable of performing. AS 09.50.050. This remedial confinement to rectify a continuing act of contumacy is quite different from the fixed sentence meted out to the appellant at bar for her past actions.

Reversed and remanded to the court below for further proceedings in conformity with this opinion.

CONNOR, Justice, with whom FITZGERALD, Justice, joins (dissenting).

As I interpret the trial court's action, it entered an order for the primary purpose of assuring that appellant would not repeat her misconduct in taking the children contrary to the divorce decree. This situation strikes one as being remedial and, therefore, civil in nature.

At the outset of the contempt proceeding the trial court made clear on the record that it deemed this matter to be a civil contempt, affecting the rights of the parties, as distinguished from a criminal contempt affecting the powers of the court. Furthermore, the court imposed a suspended jail sentence on the condition that appellant not violate the terms of the earlier divorce decree with respect to custody. Thus the court's order looks to the future and is for the purpose of insuring compliance with the earlier decree.

Our decisions in Baker v. City of Fairbanks, 471 P.2d 386 (Alaska 1970), State v. Browder, 486 P.2d 925 (Alaska 1971), and Johansen v. State, 491 P.2d 759 (Alaska 1971), do not necessitate the grant of a jury trial in this or similar cases.

In *Baker* we held that a jury trial is guaranteed in any "criminal prosecution," and a "criminal prosecution" was defined as "any offense a direct penalty for which may be incarceration in a jail or penal institution."[1] Baker had been charged

---

7. We note that the defendant in *Johansen* received a deferred sentence, which was to coerce future compliance with the order. We deemed that sentence, like the one imposed here, punitive in nature.

8. 486 P.2d at 943.

1. Baker v. City of Fairbanks, 471 P.2d 386, 401–402 (Alaska 1970).

with an assault, which was a criminal offense under the city's ordinances. Our ruling was concerned with effectuating a fundamental constitutional right to jury trial in criminal prosecutions.

Mrs. Gwynn is not being charged with a crime, but is being sued for the purpose of enforcing and vindicating her ex-husband's private rights. Thus, the *Baker* rationale is inapposite to the present case.

In State v. Browder,[2] we held that a right to a jury trial attaches in every direct criminal contempt proceeding. Browder had been found in contempt for bringing a shotgun into a courtroom during a court session. His conviction was reversed on appeal.

The principle of the *Browder* case does not require a jury trial in the case at bar. First, the act in *Browder* constituted direct contempt of court, whereas here the conduct in question is clearly of an indirect nature. The *Browder* ruling reflects a concern for the potential harm which may result from allowing a judge who has been directly affronted to sit as "prosecutor, trier of fact, and judge in the same proceeding."[3] In the present case the trial judge was not acting as the prosecutor and, of course, it is quite common and permissible for a judge to act as both the trier of fact and the judge in the same case.

Second, the *Browder* proceeding was purely criminal in nature. In contrast, the present action was brought by a private party, and was regarded by the trial judge as "civil" in nature. Finally, *Browder* itself acknowledges the propriety of summary hearings in cases such as the one at bar. In enumerating the various safeguards which would assure the orderly conduct of court despite jury trials in direct criminal contempts, we noted that a trial judge "retains the authority to imprison [summarily] for civil contempt in appropriate instances."[4] Thus *Browder* provides no support whatever for appellant's position.

In Johansen v. State, 491 P.2d 759 (Alaska 1971), we held that a defendant facing civil contempt and penal incarceration for non-payment of support money, was entitled to a jury trial on the issue of his ability to make such payments. Because of the unique facts and assertions in *Johansen,* there were two separate grounds for granting a jury trial in that case. Neither is applicable here.

The first reason that a jury trial was ordered in *Johansen* was that non-support constitutes a crime under Alaska's criminal statutes.[5] AS 09.50.030 provides:

"A person who is charged with contempt of court not committed in the presence of the court, where the act or

---

2. 486 P.2d 925 (Alaska 1971).

3. State v. Browder, 486 P.2d 925, 939 (Alaska 1971).
Several other courts have focused on the distinction between "direct" and "indirect" contempts. Thus, in Maita v. Whitmore, 365 F.Supp. 1331, 1339 (D.C.Cal.1973), the federal district court in dictum recognized that the need for procedural safeguards is much stronger in direct contempt proceedings than in indirect contempt proceedings. *Compare* Maita v. Whitmore, supra, *with* United States v. Seale, 461 F.2d 345 (7th Cir. 1972).
Recently the Colorado Supreme Court ruled on the procedural safeguards which must attach to non-serious, *indirect* contempts. The court specifically listed notice, counsel, confrontation of witnesses and findings of fact. Conspicuous by its absence was the right to a jury trial. Losavio v. District Court, 512 P.2d 266, 268 (Colo.1973).

4. State v. Browder, 486 P.2d 925, 939 (Alaska 1971).

5. AS 11.35.010 provides:
"A person who is the parent or guardian of a child under the age of 16 years dependent upon him for care, education or support, and who deserts or abandons the child or ward, or wilfully fails, without lawful excuse, to furnish necessary food, care, clothing, shelter, medical attendance, education or support for the child or ward; or a person who, without lawful justification, wilfully abandons and leaves his wife or refuses or neglects to provide his wife with necessary food, clothing, shelter or medical attendance, is guilty of a misdemeanor, and upon conviction is punishable by a fine of not more than $500, or by imprisonment in a jail for not more than 12 months, or by both. However, before the trial, with the consent of the defendant,

thing so charged as a contempt is of such nature as to constitute also a criminal offense under a statute of the United States or a law of this state, has a right to a jury trial."

Thus the court held that "[o]n this basis alone, the superior court's order of contempt must be reversed"[6] and a jury trial in non-support contempt cases must be afforded. We have reviewed the record in the present case and are convinced that no act which would constitute an independent crime has been committed by Mrs. Gwynn. Therefore, the first rationale for granting a jury trial in *Johansen* is inapposite here.

The second rationale in *Johansen* reflects the same policy concerns which prevailed in both *Baker* and *Browder*. In *Johansen* the defendant claimed that he was *unable* to comply with the court's order; i. e., he was too poor to make his support payments. If Johansen's defense was true, Selma Johansen, the moving party, could not possibly gain any child support from having the poverty-stricken, respondent incarcerated. Indeed, incarceration under those circumstances almost certainly would have assured that Mr. Johansen would remain unable to make payments, since one cannot be expected to be gainfully employed while in jail. Thus, if the facts were as the defendant asserted, any subsequent imprisonment would obviously be of a criminal nature, since any coercive or remedial effect would be logically impossible. Because a jail sentence in *Johansen* might

constitute a purely punitive penalty, a jury trial was regarded as appropriate.

Logic does not dictate a comparable conclusion in the present case. Mrs. Gwynn's defense appears to be that her conduct was not "wilful" contempt because concern for her childrens' welfare compelled the course of conduct which she took. Assuming arguendo that her fears were genuine and justified, it does not follow that Mrs. Gwynn was at any time *incapable* of complying with the court's decree. At no time did she raise such a claim of disability.

The desirability of a jury trial should be tested against the separate purposes which criminal contempt and civil contempt are meant to serve. Criminal contempt serves to redress injuries to the power of the court. The underlying notion is that affronts to the power of the court itself are such a serious threat to the integrity of the legal system that they must be sanctioned as a criminal offense. Thus they have been so denounced by AS 09.50.010. And because they are criminal offenses it follows from Baker v. City of Fairbanks, *supra*, that jury trial is available to one so charged.

The purpose of civil contempt proceedings is to enforce compliance with an order or process of a court by one party to a proceeding, for the benefit of the other party. It is to assure that the rights of a party, once established by an order or judgment, shall not be frustrated by the re-

---

or after conviction, instead of imposing the penalties prescribed, or in addition to those penalties, the court, having regard to the circumstances and the financial ability and earning capacity of the defendant, may make an order, subject to change by it from time to time as circumstances require, directing the defendant to pay a definite sum or a certain weekly sum during such time as the court may direct, into the court for the benefit of wife, or guardian or custodian of the minor child; and the court may release the defendant from custody or place him on probation during such time as the court directs, upon his entering into an undertaking with one

or more sufficient sureties who shall qualify as bail upon arrest in a sum the court directs. The undertaking shall be conditioned so that the defendant shall personally appear before the court whenever ordered to do so and shall at all times comply with the terms of the order or any modification which the court may make, and shall provide that, should the conditions of the bond be broken, the defendant and his sureties consent to entry of judgment against them by the court in the amount specified in the undertaking."

6. Johansen v. State, 491 P.2d 759, 762 (Alaska 1971).

fusal of the other party to obey the law's command.

Coercive force is one of the primary criteria by which law, properly so-called, is distinguished from mere social obligation and rules of prudence not having the force of law. Without the availability of civil contempt, the law as between private parties loses its coercive quality, and for all practical purposes becomes mere voluntarism rather than law. The ability of one party to invoke the remedy of civil contempt is vital to the functioning of the legal order, as well as the effectuation of the particular rights which that party seeks to enforce.

To be effective, the remedy of civil contempt must be expeditious, relatively certain, and of such a nature that it will, by the exertion of increasingly onerous pressures, compel ultimate compliance with the established right of the other party to require either action, or forebearance from action, by the party who has committed the civil contempt. A requirement of jury trial can, in some instances, lead to a flaunting of civil process by an unreasonable party to a civil action. For example, imposing punishment for past acts is of no avail if no deterrent exists against future contumacy. But civil contempt by its nature looks to the future. Its purpose is to compel future conduct in conformity with a valid judicial order.

Furthermore, a jury trial not only makes the civil contempt remedy cumbersome, it permits a recalcitrant party to argue and persuade a jury that his conduct was not sufficiently wilful to constitute a crime. Yet the purpose of civil contempt is not to determine whether a person is a criminal, but merely to assure that a person, whether or not he possessed a criminal intent, will comply with a valid order of the court.

The case at bar is a good example of the civil contempt power in action. In response to telephone calls from her children, Mrs. Gwynn arranged for them to leave their father's legal custody and come to her. When they arrived in Anchorage,

Mrs. Gwynn took them in and made no effort to apprise anyone that she had custody of the children. At no time did she seek legal modification of the custody decree.

All of this was in clear derogation of Mr. Gwynn's rights. The record in no way reveals that Mr. Gwynn was anything but a fit parent. Mrs. Gwynn herself admitted that the children appeared to be in "fairly good health". Despite these facts, or perhaps because of them, Mrs. Gwynn wholly ignored the orderly processes of law and violated the terms of a lawful custody decree. Mr. Gwynn, by initiating this contempt proceeding, sought to ensure that this type of conduct would not be repeated in the future. It was the only meaningful relief which he could demand, since Mrs. Gwynn had already relinquished custody of the children.

To forestall a repetition of this conduct the civil contempt powers were invoked in this case. The trial judge was careful to denominate this contempt as being civil in nature, both at the outset of the hearing and at the time he entered his order. The order entered prospectively was calculated to prevent a repetition of the mother's misconduct, without regard to whether that conduct might have amounted to a crime. To impose a requirement of jury trial adds nothing to the process of preventing contumacious conduct in the future.

The one subjected to civil contempt sanctions should, of course, have available some protection against being singled out for arbitrary or unduly harsh judicial action. That can be accomplished, however, by the normal processes of review to determine whether in a given case an abuse of discretion has occurred. Again, a jury trial is not necessary as a safeguard for the one subjected to a civil contempt proceeding.

In summary, a jury trial is neither mandated nor appropriate in a case of this kind.

For the reasons stated, I would affirm the order of the superior court.