**In the Matter of Bruce D. ELDER,**

**Regarding contempt citations issued in In the Matter of The Guardianship/Conservatorship Of Michael J. Elder, Superior Court No. 3AN–87–514 P/G.**

No. S–2321.

Supreme Court of Alaska.

Oct. 14, 1988.

Scott A. Sterling, Jensen, Harris & Roth, Anchorage, for Bruce D. Elder.

Phyllis A. Hartke, Law Office of Thomas H. Dahl, Anchorage, guardian ad litem for Michael J. Elder.

Barbara L. Malchick, Office of Public Advocacy, Anchorage, for public guardian, temporary guardian/conservator of Michael J. Elder.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

OPINION

BURKE, Justice.

Bruce Elder was held in contempt of court and was incarcerated for an indefinite period pending the return of certain funds which he allegedly misappropriated from his brother, Michael Elder. Bruce challenges the propriety of the incarceration order. We reverse.

I

On May 17, 1987, Michael Elder was rendered comatose as a result of an automobile accident. On June 5, Probate Master Kathleen Harrington appointed as Michael's temporary guardian his brother, Bruce Elder.

At the initial guardianship hearing, Bruce indicated that he intended to retain an attorney for the purpose of pursuing Michael's legal remedies in connection with the accident. He later decided, however, to personally settle Michael's claim against the driver of the vehicle involved.[1] On June 8, 1987, Bruce settled on Michael's behalf with Allstate Insurance Co., for $100,000. The same day an account was opened in Bruce's name at United Bank of Alaska (UBA). On June 9, Bruce wrote six checks against the account, disbursing a total of $97,930. The amounts and payees were as follows:

(1) $15,000 to Bruce Elder;

(2) $10,000 to Bruce Elder;[2]

(3) $39,930 to Clifford "Buzz" Aldeman, Bruce's father-in-law;

---

1. Bruce testified that he had "talked to several attorneys" who advised him to settle the case without "pay[ing] a percentage" to an attorney since the maximum he could ever hope to recover was $100,000, the limit under the applicable insurance policy.

2. Of the $25,000 which Bruce disbursed to himself, $18,345 was almost immediately reinvested in an automobile purchased from a local auto dealership.

(4) $8,500 to Larry Voelk, Bruce's step-father-in-law;

(5) $12,500 to Odis Elder, Bruce and Michael's father;

(6) $12,000 to Robert Campbell, a close friend of Bruce and Michael's.

Bruce contends that the foregoing disbursements were made to repay legitimate debts incurred either by Michael personally or by a failed business partnership which Michael and Bruce had formed some years before.[3] Bruce also contends that he was advised by counsel that, as guardian, he was entitled to pay Michael's debts.

On June 10, Ernest Schlereth, who had served as Michael's appointed counsel at the guardianship hearing, learned that Bruce had settled Michael's insurance claim with Allstate. Concluding that such settlement was improper,[4] Schlereth sought, and was granted, a temporary restraining order against both Allstate and Bruce Elder. The order provided in pertinent part:

It is hereby ORDERED that Allstate Insurance Company take immediate steps to stop payment on the check in the amount of $100,000 issued to Bruce D. Elder. . . .

It is also ORDERED that Bruce D. Elder is enjoined from in any way disbursing or cashing the funds of this check and is ORDERED to hand over to the State Trooper serving this order or to bring the same to the Probate Court for registry into the court, and appear at the below hearing date.

The order was to remain in effect for ten days, pending a hearing on the motion for preliminary injunction scheduled for June 16, 1987.

Elder was served with the temporary restraining order on the afternoon of June 10. Having already made numerous disbursements from the UBA account, Elder did not produce the requested funds when served with the order. He told the trooper that "Mr. Schlereth had told him that it was okay to put the money into the bank and pay the bills", and thus, he did not understand why the temporary restraining order was being issued.

A hearing was convened before Probate Master Harrington on June 16, 1987. It was learned at this hearing that payment on the Allstate check had not in fact been stopped and that, as a consequence, all of the disbursements made by Elder on June 9 had cleared the bank, leaving only $2,070 of the original $100,000 deposited in the UBA account. The probate master advised Schlereth to seek an immediate "show cause" hearing concerning possible contempt in connection with the June 10 temporary restraining order.[5]

On June 17, Superior Court Judge Victor D. Carlson issued an order to "show cause why [Elder] should not be held in contempt of court for failure to abide by the Temporary Restraining Order dated June 10,

---

**3.** The money paid to Robert Campbell and Odis Elder was in payment of alleged personal debts incurred by Michael. The other third party payees received their funds in repayment of loans allegedly made to "Elders Diversified Services," the now-defunct snowplowing business started by the two brothers some years ago. Of the funds which Bruce disbursed to himself, $15,000 was in repayment of loans Bruce had made to the partnership, and $10,000 was for the 10% "legal fee" which he was allegedly advised that he could pay himself for handling Michael's affairs.

**4.** Schlereth took the position that any settlement which did not involve thorough consultation with an attorney violated Elder's duties as guardian/conservator and was thus unauthorized.

**5.** The master also (1) terminated Elder's temporary guardianship, (2) made the earlier Temporary Restraining Order a preliminary injunction, and (3) expanded the scope of the order to require that Bruce

take immediate steps to retrieve funds and turn into the registry of the court from said insurance proceeds, which may have been disbursed, and provide immediate information, through his attorney to the guardian ad litem, as to the specific distribution of said funds, providing names and numbers of accounts, amounts deposited, and persons to whom funds were given.

Notably, Elder was not held in contempt for violating the added language directing him to take "immediate steps" to retrieve the funds. Rather, he was jailed for failing to comply with the wording of the June 10 order requiring him to "hand over to the State Trooper" the funds from the Allstate check.

1987."[6] At the June 19 show cause hearing, Elder's counsel informed the judge of Elder's prior actions and argued that Elder had "accomplished all that [the] order prohibited well prior to receiving notification of that order." He also informed the court that opposing counsel had been provided with copies of the checks and the names of the persons to whom the funds were paid out. Several of the individuals who had received funds testified. Each stated that the money he received was in payment of a bona fide debt. One of these individuals, Clifford Aldeman, surrendered his $39,930 check to the court on the spot. Elder offered immediate return of the $2,070 remaining in the original account. He also offered to take immediate steps to liquidate the auto he had purchased with his share, and to secure the return of the $8,500 paid to Larry Voelk, who had indicated a willingness to voluntarily release those funds.

Notwithstanding the above, the court concluded that it was appropriate to hold Elder in civil contempt and to imprison him until such time as the remaining funds, some $62,000, were actually returned to Michael's newly-appointed guardian. The judge, in his oral contempt ruling stated:

> Mr. Bruce Elder is being taken into custody under civil contempt to be held pending the posting of $62,000 in bonds satisfactory to the court or until he otherwise satisfies all of the requirements of the order which was previously entered. It appears to me that he has acted fast and loose with someone else's money, namely the estate's money. Whether he had authority to make these decisions or not, that is somewhat different than when one fails to abide by their fiduciary duty in handling someone else's money.

Elder was immediately incarcerated.

On June 29, 1987, a further hearing was held concerning Elder's incarceration. At this hearing, Elder offered to tender certain additional funds which he had obtained during his incarceration. He also informed the court that he was having difficulty liquidating the $18,000 vehicle he had purchased with his share of the funds, but he offered to tender immediate possession of the vehicle to the Office of Public Advocacy. The tender was refused. The court informed Elder that it was his responsibility to liquidate the assets, and that he would "get[ ] out of jail when the money's returned." The court also noted that "[t]here's no six month limitation on this type of contempt," and that Elder would "be [in jail] until he does what he's supposed to do."

On August 5, 1987, Elder filed the present appeal and moved for an emergency stay of incarceration pending resolution of this matter. The motion was granted on August 7, 1987.

Since his release from custody, Elder has acquired a job,[7] and has begun making regular payments to the Office of Public Advocacy, Michael Elder's current temporary guardian. He has liquidated the automobile, and has been able to replace approximately 80% of the originally disbursed funds. While some of the third-party payees still refuse to return the funds they received, thus prohibiting immediate return of the entire $100,000, Michael's guardian ad litem and the Office of Public Advocacy now agree that Bruce's current level of cooperation warrants his release from jail.

## II

Bruce Elder was imprisoned without a jury trial and without any of the traditional procedural protections afforded criminal defendants under the United States and Alaska Constitutions. Consequently, his incarceration is proper only if it qualifies as a sanction based upon civil coercive contempt. *See Pharr v. Fairbanks North Star Borough*, 638 P.2d 666, 669 (Alaska 1981); *Gwynn v. Gwynn*, 530 P.2d 1311, 1312 (Alaska 1975).

---

**6.** On the same day, the court issued a temporary restraining order directing UBA to place holds on all accounts into which portions of the $100,-000 may have been transferred.

**7.** Elder was unemployed at the time of his incarceration.

In Alaska, the court's inherent power to impose sanctions for civil contempt is codified at AS 09.50.050 (emphasis added):

When the contempt consists of the omission or refusal to perform an act *which is yet in the power of the defendant to perform*, the defendant may be imprisoned until the defendant has performed it.

That the act ordered by the court be "yet in the power of the defendant to perform" at the time of his incarceration is perhaps the most fundamental aspect of the civil contempt sanction, and is the primary factor distinguishing this judicial remedy from its criminal counterpart, with the latter's attendant procedural safeguards.[8]

Although we have noted on a number of occasions that inability to comply with the court's order is an "affirmative defense" on which the contemnor bears the burden of proof, *Johansen v. State*, 491 P.2d 759, 766 (Alaska 1971); *see also Diggs v. Diggs*, 663 P.2d 950, 951 (Alaska 1983); *State, Dep't of Revenue v. Oliver*, 636 P.2d 1156, 1159 (Alaska 1981), we have also made clear that, once established by a preponderance of evidence, inability to comply is an absolute bar to imprisonment based upon civil contempt. *See, e.g., Ryfeul v. Ryfeul*, 650 P.2d 369, 375 (Alaska 1982); *Johansen*, 491 P.2d at 767; *see also Hicks v. Feiock*, —— U.S. ——, —— n. 9, 108 S.Ct. 1423, 1433, n. 9, 99 L.Ed.2d 721, 735 n. 9 (1988) ("[o]ur precedents are clear ... that punishment may not be imposed in a civil contempt proceeding when it is clearly established that the alleged contemnor is unable to comply with the terms of the order"). The reason for such a rule is simple: "[w]here confinement cannot serve to accomplish the direct remedial object sought, or where there is no remedial objective left to be achieved, any incarceration—even when designated civil in nature—takes on a clearly punitive character," and thus gives rise to the need for procedural protections. *Gwynn*, 530 P.2d at 1312 n. 6.

The record in the instant case contains no finding by the court that Elder was capable of complying with the terms of the June 10 order at the time of his incarceration,[9] nor would such a finding have been justified based on the evidence before the court. It was undisputed at Elder's contempt hearing that the majority of the $100,000 produced by the settlement was transferred to third parties even before the June 10 temporary restraining order was issued, and well before the hearing to consider Elder's incarceration.[10] The remainder, which Elder had distributed to himself, was no longer in the form of cash, but had for the most part been invested in an automobile purchased prior to the contempt hearing.[11] At the hearing, Elder offered immediate tender of the automobile, as well as all of the cash remaining in his possession. Beyond these measures, it is apparent that, at the time of his incarceration, Elder was unable to "hand over to the State Trooper" the cash assets sought in the June 10 or-

---

**8.** A criminal contempt proceeding involving the threat of incarceration is a "criminal prosecution" within the meaning of the Alaska Constitution, *State v. Browder*, 486 P.2d 925, 937 (Alaska 1971), and thus entitles the contemnor to full criminal procedural safeguards prior to imprisonment. *Johansen v. State*, 491 P.2d 759, 766 n. 27 (Alaska 1971).

**9.** Contempt proceedings, like all other "actions tried upon the facts without a jury," are subject to the provisions of Civil Rule 52, requiring that specific findings of fact and conclusions of law accompany the judgment. Alaska R.Civ.P. 52(a). Under this rule, the judgment of the superior court is subject to remand where the court's findings are insufficient to provide the reviewing court with a clear understanding of the basis of the court's decision. *See Uchitel Co.*

*v. Telephone Co.*, 646 P.2d 229, 236 n. 16 (Alaska 1982); *Wigger v. Olson*, 533 P.2d 6, 7–8 (Alaska 1975); *Spenard Plumbing & Heating v. Wright*, 370 P.2d 519, 525 (Alaska 1962).

**10.** The record suggests that some or all of the third party checks, though written and delivered prior to issuance of the temporary restraining order, may have actually cleared the bank sometime thereafter.

**11.** The guardian ad litem contends that the funds for the purchase of the automobile were actually delivered to the dealership *after* the issuance of the temporary restraining order. Such action would likely conflict with the plain wording of the court's order and, if proved, might support a conviction for criminal contempt under AS 09.50.010–.020.

der, as those assets were no longer in his personal possession.

The court could, of course, have ordered Elder to take all reasonable steps to secure release of the disbursed funds from the third-party payees. *See Johansen,* 491 P.2d at 768–69 (contemnor may be ordered to make a reasonable effort to raise overdue child support). It could also have ordered Elder either to tender immediate possession of the automobile to the guardians or to take reasonable steps to liquidate that asset as soon as possible. In either case, Elder's refusal to comply would have constituted a valid ground for imposing civil contempt sanctions. However, we see no legitimate coercive purpose to be served by imprisoning an individual for failing to perform an act, the completion of which is necessarily dependent upon action by a third party.

In sum, we hold that inability to comply is established, as a matter of law, where the undisputed evidence shows either that the funds or property ordered produced are in the hands of third parties over whom the alleged contemnor has no legal control, or that such funds or property have been converted into some form of asset which the court refuses to accept upon immediate tender. Elder made such a showing here, and, accordingly, the superior court erred in ordering his incarceration without the benefit of a jury trial and without any of the procedural protections available to criminal defendants.

In reaching the above conclusion, we do not mean to suggest that the transference or conversion of court-sought assets is an acceptable means of avoiding lawfully issued court orders. On the contrary, such conduct may give rise to criminal charges ultimately resulting in the contemnor's incarceration for some definite period. Imprisonment for civil coercive contempt, however, must be strictly limited in its application lest it intrude upon those constitutionally guaranteed liberties which the courts are sworn to protect. The imprisonment of an individual pending the return of cash assets which, on the undisputed evidence, he no longer personally possesses, crosses the boundaries of acceptable judicial action.[12]

The order of the superior court is REVERSED, and the matter is REMANDED for further proceedings consistent with this opinion.[13]

[redacted]

12. In *Maggio v. Zeitz,* 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1947), the United States Supreme Court reached a similar conclusion on analogous facts. In that case, the president of a bankrupt corporation was ordered jailed for failing to turn over to the bankruptcy trustee certain assets which he contended were no longer in his possession. *Id.* at 59–60, 68 S.Ct. at 403, 92 L.Ed. at 481–82. The Court reasoned:

> Conduct which has put property beyond the limited reach of [a] turnover [order] may be a crime, or, if it violates an order of the referee, a criminal contempt, but no such acts, however reprehensible, warrant issuance of an order which creates a duty impossible of performance, so that punishment can follow. *It should not be necessary to say that it would be a flagrant abuse of process to issue such an order to exert pressure on friends and relatives to ransom the accused party from being jailed.*

*Id.* at 64, 68 S.Ct. at 405, 92 L.Ed. at 484 (emphasis added). To the extent that Elder's incarceration may have been aimed at securing the return of those funds paid out to his own friends and relatives, it clearly ran afoul of this basic principle.

13. On remand, the court may issue such orders, supported by appropriate findings and consistent with the principles discussed herein, as are necessary to secure the return of those funds which remain outstanding.